IN THE MATTER OF THE 1976 HOSPITAL REIMBURSE-MENT RATE FOR WILLIAM B. KESSLER MEMORIAL HOSPITAL.

Argued September 25, 1978—Decided January 11, 1979.

*Ms. Charlotte Killer,* Deputy Attorney General, argued the cause for appellant Department of Health, State of New Jersey (*Mr. John J. Degnan,* Attorney General of New Jersey, attorney; *Ms. Erminie L. Conley,* Deputy Attorney General, of counsel).

*Mr. Peter T. Manzo,* Assistant Deputy Public Advocate, argued the cause for appellant Public Advocate (*Mr. Stanley C. Van Ness,* Public Advocate, attorney).

*Mr. Charles Lee Harp, Jr.,* argued the cause for respondent William B. Kessler Memorial Hospital (*Messrs. Archer, Greiner & Read,* attorneys).

The opinion of the court was delivered by

SULLIVAN, J. This case involves a dispute between William B. Kessler Memorial Hospital (Kessler) and the State Department of Health (Department) over the calculation of the per diem rate for 1976 at which Blue Cross and Medicaid were to reimburse Kessler for covered patient hospital care. The administrative decision was made pursuant to the Health Care Facilities Planning Act, *N. J. S. A.* 26:2H–1 *et seq.* in a proceeding in which Kessler challenged the per diem rate set for Blue Cross and Medicaid patients.

The Act was passed in 1971 in response to widespread public concern over the spiraling costs of institutional health care. It declared the public policy of the State to be

\* \* \* that hospital and related health care services of the highest quality, of demonstrated need, efficiently provided and properly utilized at a reasonable cost are of vital concern to the public health. [*N. J. S. A.* 26:2H-1]

Prior to 1974, the hospital rate-setting process was largely a peer review program administered by the hospital industry itself with routine approval being given by the Commissioners of Health and Insurance. However, in 1974, it became apparent that the program was resulting in substantial annual increases in hospital costs in excess of guidelines promulgated under the federal Economic Stabilization Act of 1970. Accordingly, it was determined that a greater degree of State involvement in the rate-setting process was necessary, and hospitals were notified that beginning in 1975 the State would fully implement its rate-review authority under the Act.

In 1975, detailed rate review guidelines were issued by the Commissioners of Health and Insurance. Hospitals were required to submit itemized proposed budgets to the Department using forms and a cost reporting system specified in the Standard Hospital Accounting and Rate Evaluation (SHARE) Manual promulgated by the Department of Health.[1]

The instant case involves the fixing of the 1976 per diem rate at which Blue Cross and Medicaid were to reimburse Kessler for covered patient hospital care. Under the 1976

---

[1]By L. 1978, c. 83 (approved and effective July 20, 1978) The Health Care Facilities Planning Act has been substantially amended. One of the amendments, *N. J. S. A.* 26:2H-4.1, establishes in the State Department of Health a Hospital Rate Setting Commission of which the Commissioners of the State Departments of Health and Insurance are *ex officio* members. The Commission is vested with plenary power over hospital rates.

guidelines, hospitals in the fall of 1975 submitted proposed 1976 budgets in the manner and form required by the SHARE manual. Included were the hospital's approved 1975 budget figures and projected actual 1975 costs. Dependent on the percentage of increase sought in estimated costs, the proposed budget was subjected to a detailed analysis.

Basically, the analysis involved a two-step process. First a budget base was determined by comparing the previous, or base, year's cost figures with those of similar hospitals (peer comparison). If any of the previous year's costs exceeded the cost of the median in the peer grouping by a certain percentile, the excess was deducted from the base year costs. This budget base was then adjusted to account for various differences projected for the coming year such as inflation, volume and other economic factors. The hospital's budgeted expenditures which exceeded this adjusted base were excluded from the calculation of the proposed per diem rate. The hospital was then notified of the proposed rate and of the proposed costs that had been challenged as presumptively unreasonable.

In the present case Kessler had submitted its proposed budget for the year 1976 to the Department of Health. So far as is here relevant, the budget was challenged by a departmental analyst as to two proposed cost items. With regard to the emergency room center, the analyst challenged $124,871 of the proposed costs as unreasonable. The newborn nursery center had $12,000 of its proposed costs similarly challenged.

When Kessler was unable to adjust the matter with the analyst, it filed an administrative appeal. Hearings thereon were conducted before a hearing officer in July 1976, and on September 22, 1976 the hearing officer recommended that the challenges to the two cost centers be sustained. In December 1976 the hearing officer's report was upheld and Kessler was notified that its final administrative rate (which did not include the challenged costs in its computation) had been approved at $134.60 per diem.

Kessler appealed the administrative determination to the Appellate Division which reversed in an opinion reported at 154 *N. J. Super.* 147 (1977). The Appellate Division found that the challenged amounts, $124,871 in the emergency room center and $12,000 in the newborn nursery center, represented costs required by Department of Health licensing regulations, and that the agency's decision to exclude those costs was without evidential foundation and was arbitrary and capricious. This Court granted certification. 75 *N. J.* 616 (1978).

■ With regard to emergency room center costs, some background is needed. Prior to July 1975, Kessler had staffed this center with interns. In 1975, as a result of an incident in its emergency room, Kessler was cited for violation of a departmental regulation which requires 24-hour licensed physician coverage in an Emergency Department in a hospital. As a result of this incident, Kessler began to staff its emergency center with licensed physicians present in the center on an around-the-clock basis. This resulted in a substantial increase in emergency room costs which was included in the proposed 1976 budget.

The administrative decision which is the subject of this appeal disallowed the increase to the extent of $124,871 on the ground that while the departmental regulation required 24-hour physician *coverage* of the emergency room center, it did not mandate 24-hour *staffing* of the center with a physician present on an around-the-clock basis. Instead, the administrative decision indicated that the extent of emergency room physician coverage depended on need, that a physician could have other duties in the hospital and, depending on the volume, also cover the emergency room. The decision was to the effect that Kessler should establish a plan for physician *coverage* of its emergency room center adequate to meet its needs and that this would be a compliance with the departmental regulation.

We agree that the regulation does not require 24-hour *staffing* of the emergency room with a licensed physician present at all times. It does require physician coverage of the emergency room through the establishment of a plan to provide coverage, the extent of which would necessarily depend on the particular needs which the hospital had to meet. However, this interpretation does not fully resolve the problem.

At the administrative hearing, Kessler, in addition to contending that the regulation required it to staff its emergency room center with licensed physicians present on an around-the-clock basis, also argued that, even if the regulation were to be satisfied by establishing a plan of physician coverage other than staffing, Kessler could not meet that requirement because of physical location of the hospital, volume and kind of emergency room cases and lack of any house physician. It asserted that there were no physicians living, or having offices, near the hospital and that the members of its staff of physicians were mostly specialists not particularly adaptable to emergency room coverage.

In short, Kessler urged that its situation was such that the only way it could provide physician coverage of its emergency room adequate to meet its needs was to staff it in the manner provided for in its budget.

This latter issue, an important consideration, is not resolved by the administrative decision which was limited essentially to interpretation of the departmental regulation. The Appellate Division, apparently in the exercise of its original jurisdiction, decided this question in favor of the hospital. However, the very nature of the problem calls for the application of departmental expertise and experience in the first instance. The Department's evaluation of the factors relied on by Kessler would carry substantial weight on judicial review.

Therefore, we conclude that protection of the public interest and fairness to Kessler require that the matter be re-

manded to the Department for consideration of this issue. To the extent necessary, the hospital should have the opportunity to expand the record to expose its position fully. It may well be that partial staffing of the emergency room and partial coverage by other hospital physicians would be adequate.

The Appellate Division opinion was critical of the way the Department had used peer group comparison as one of the mechanisms in the rate-setting process. The Appellate Division stated that the costs compared must be derived from hospitals which are truly comparable and that there was evidence of significant differences between Kessler and the peers to which it was compared. It also indicated that the Department should have made findings that Kessler's peers were comparable and how their differences, if any, were, or were not, significant to their cost experience.

We disagree. Peer comparison has always been recognized as useful in the analysis of hospital budgets. However, no two hospitals are exactly alike. Thus, to require the Department, in peer review, to make specific findings as to what differences existed between the hospitals in the peer group (statewide peer grouping could involve over one hundred hospitals), and the extent to which these differences may affect cost experience, would complicate the process to a point where it would drain peer comparison of its usefulness and efficiency as a rate review tool.

While the Department may not act arbitrarily in its peer groupings and comparisons thereunder, we must recognize its expertise and experience in this field and allow it considerable flexibility in the use of the peer comparison mechanism as a rate review tool. The record does not indicate that the Department has acted improperly or arbitrarily in the matter.

As to the $12,000 at issue in Kessler's newborn nursery center costs, the Appellate Division held that full time registered nurse staffing of the center was required for compliance with a Departmental regulation which provides:

(a) Separate personnel shall be assigned to the obstetrical service which shall be under direct supervision of a registered professional nurse at all times. If the caseload does not justify the total time of one nurse on each tour of duty, exception may be made by action of the hospital licensing board after submission and approval of written techniques. * * *

(b) There shall be at all times, day and night, registered professional nurse supervision of the nursing care of mothers and infants, and such other nursing supervision and coverage as is required.

[*N. J. A. C.* 8:43B–8.4 (a) (b)]

Under this regulation, full time registered nurse staffing was generally required for the nursery as well as for the obstetrical service. Exceptions to this regulation were permissible for hospitals having a small caseload and the Department would allow the hospital to use licensed practical nurses when there were fewer than two babies in the nursery and registered nurse supervision was not necessary. This substitution of licensed practical nurses in the nursery did not require Departmental approval. However, in the obstetrical unit, substitution could be made only after submission and approval of written techniques. *N. J. A. C.* 8:43B–8.4(a). Kessler had applied for such approval for its obstetrical service which was denied because of its practice of mixing obstetrical patients with gynecological and other female medical/surgical patients.

The Appellate Division, while it recognized the low volume of newborn babies (300 per year) concluded, contrary to the administrative decision, that full staffing of the newborn care center by registered nurses was required by departmental regulations even though there was substantial underutilization of the facility. In this regard we find it to have been in error. The State regulations do permit a hospital, depending on volume, to use licensed practical nurses instead of registered nurses in a newborn care center. The underutilization of the newborn nursery center contributed substantially to the challenge of $12,000.[2] The

2The record indicates that Kessler now has discontinued the use of its newborn care center because of underutilization.

amount challenged "was generated in total accord with the 1976 SHARE guidelines." The record amply supports the administrative decision.

The judgment of the Appellate Division is reversed and the matter remanded to the Department for further proceedings in accordance with this opinion.

HANDLER, J., concurring. I find myself in agreement with the opinion of this Court. Because of the novelty, complexity and importance of the issues involved in this litigation, I feel constrained to comment upon certain aspects of the controversy and the manifold problems which it presents.

I

The Health Care Facilities Planning Act of 1971, *N. J. S. A.* 26:2H-1 *et seq.,* represents a new governmental approach in this State for dealing with the acute social concerns over the escalating costs of hospital health care and services. It fashions a legislative and administrative regulatory format governing health care facilities and services which are deeply impressed with the public interest and general welfare. Primary responsibility for administering the State's health care program is vested by the Act in the State Department of Health. The regulatory tools of the Commissioner of Health are directed to two major areas, economy and quality. Through the transfer of jurisdiction over hospital licensing from the former Department of Institutions and Agencies, the Department of Health oversees the quality of hospital care. *N. J. S. A.* 26:2H-12, -13, -19, -22. Cost-containment and efficiency are addressed through the certificate of need program which requires health care providers to demonstrate that any proposed creation or expansion of services is necessary, economical and consistent with the orderly development of adequate health care services, *N. J. S. A.* 26:2H-7 to 11; *St. Vincent's Hospital v. Finley,* 154 *N. J. Super.* 24 (App.

Div. 1977); *St. Joseph's Hospital and Medical Center v. Finley,* 153 *N. J. Super.* 214 (App. Div. 1977), certif. den. 75 *N. J.* 595 (1978) ; and through statutory provisions which authorized the Commissioner of Health, in cooperation with the Commissioner of Insurance, to certify and regulate certain costs of health care services. *N. J. S. A.* 26:2H-5, -18.[1]

In September 1974 the State notified hospitals that beginning in 1975 the State would implement its rate-review authority under the Act. *In re 1975 Hospital Rate Review Program Guidelines, Report of Hearer,* July 3, 1975, at 8 (hereafter *Goldmann Report*). Annual Hospital Review Program Guidelines, classified as temporary regulations (Guidelines), *N. J. A. C.* 8:31-14, -21, which set forth criteria for "reasonableness" used to review proposed hospital budgets, were promulgated in February 1975. These were accompanied by reporting conventions specified in the Standard Hospital Accounting and Rate Evaluation (SHARE) Manual, *N. J. A. C.* 8:31A-1.1, *et seq.*

The Guidelines applicable to this appeal (1976 Guidelines) required that in the Fall of 1975, hospitals submit proposed 1976 budgets with their approved 1975 budget figures and their projected actual 1975 costs. A departmental health economics analyst would then determine initially whether the requested rate increase, evaluated in terms of the hospital's aggregate or "global budget", exceeded the 1975 rate by a

---

[1] A recent amendment to the Health Care Facilities Planning Act, *L.* 1978, *c.* 83, effective July 20, 1978, while maintaining the basic cost control scheme of the initial act, has modified the jurisdictional arrangements and slighlty altered the review procedures under the act. Rate review is now placed primarily in the hands of a Hospital Rate Setting Commission under the auspices of the Department of Health which is to regulate rates in accordance with the new statutory scheme creating "preliminary cost base[s]" and "certified rate base[s]". *N. J. S. A.* 26:2H-4.1. That amendment, of course, is not applicable to this case.

specified percentage and, if it did not, the increase would automatically be approved. *1976 Guidelines,* §§ 5(c), 7. If it did the hospital's request would be subjected to further review, entailing a comparison of the proposed budgeted operating costs for particular units of service ("cost centers"), with similar unit costs[2] derived from comparable hospitals ("peer groups").[3] *Id.* § 5(d). Costs exceeding the median unit costs specified for the particular cost-center by a particular percentage ("challenge ratio") would be deemed presumptively unreasonable, and then deducted from the adjusted budget base, *Id.* § 8 (taking into account volume changes, general inflation and other variables, *Id.* § 5(e–1)), and excluded from the calculation of the *per diem* "proposed administrative rate" for reimbursement by health service

---

[2]The unit cost was derived by dividing total allowable costs in the cost-center by a predefined unit of service, such as patient days or number of visits. The unit cost was then ranked with those of the peer group hospitals to derive a "median" reasonable unit cost. *Guidelines* § 6; Exhibit I.

[3]According to the *Goldmann Report* at 19 "[t]he approach [of the Guidelines] to determining the reasonableness of operating costs involves a multi-faceted analysis of the functions of a particular hospital within a group or groups of hospitals. This analysis comprises three essential elements which may, in summary, be described as (1) data definition by cost centers, peer groupings and units of service; (2) a method for measuring reasonableness by base period costs, cost increases and employee compensation levels, and finally, (3) the quantification of the Guidelines."

The Guidelines classified cost-centers into different levels according to the degrees of comparability deemed to exist among hospitals for the particular service. § 6. Level 1 cost-centers, defined as those for which a "good deal of commonality exists among similar hospitals", were grouped or clustered for aggregate tests of reasonableness. *Id.* §§ 6(a), 7. Level 2 cost-centers, defined as those for which "some commonality exists among similar hospitals and for which units of service are available", *id.* § 6(b), were analyzed separately. *Id.* § 7. Both the emergency room and the newborn nursery, at issue in this appeal, were classified as level 2 centers. *Id.*, § 12; Exhibit I.

corporations, such as Blue Cross and Medicaid, for covered patients. *Id.* §§ 3, 5.

This administrative review procedure was followed in this case and resulted in a determination by the Commissioners of the Departments of Health and Insurance, based upon the findings, conclusions and recommendation of a hearing examiner, to disallow for reimbursement purposes the hospital's budget requests for $124,871 to operate its emergency medical services and $12,000 for its newborn nursery services for the year 1977. In doing so, the agency rejected Kessler's main contentions that it had been forced to incur the increased costs in both the emergency room and newborn nursery cost-centers in order to comply with Department of Health hospital licensing standards and that, in addition, several of the hospitals in its emergency room peer grouping were not truly comparable because they were not in conformity to the licensing standards of the Department or because unique circumstances allowed them to conform by making less expensive staffing arrangements. The Appellate Division, however, accepted these contentions and set aside the agency determination. I believe the majority is correct in reversing the judgment of the Appellate Division.

## II

Because the administrative proceedings called for by the Health Care Facilities Planning Act are somewhat novel and unusual, we ought to address first the standard of judicial review applicable to the agency decisions arising under the Act. The Appellate Division professed to be aware that its scope of review was "traditionally limited" since the proceedings involved administrative expertise. It concluded, nevertheless, that the Department's disposition was "without evidential foundation in the record and * * * [was] an arbitrary and capricious one." 154 *N. J. Super.* at 155.

The rate-review proceedings under the Health Care Facilities Planning Act are designed in large measure to elicit

quasi-legislative determinations analogous to prospective rate-making generally characteristic of regulated industries. See *Permian Basin Area Rate Cases,* 390 *U. S.* 747, 776–777, 88 *S. Ct.* 1344, 1364–1365, 20 *L. Ed.* 2d 312, 341–342 (1968) ; *State v. N. J. Bell Tel. Co.,* 30 *N. J.* 16, 29–30 (1959) ; *Central R. Co. of N. J. v. Department of Public Utilities,* 7 *N. J.* 247, 257 (1951) ; *Public Service Coordinated Transport v. State,* 5 *N. J.* 196, 214 (1950). This administrative function ordinarily invokes judicial deference to the discretion exercised by the agency experts. *Permian Basin Area Rate Cases, supra;* see *State v. N. J. Bell Tel. Co., supra;* also *FPC v. Moss,* 424 *U. S.* 494, 500, 96 *S. Ct.* 1003, 1007, 47 *L. Ed.* 2d 186, 192 (1976). In certain contexts, it calls for a narrow scope of judicial review, one based simply upon whether or not the agency action is arbitrary or capricious. See *Ethyl Corp. v. EPA,* 176 *U. S. App. D. C.* 373, 409, 541 *F.* 2d 1, 37 (D. C. Cir.) *cert.* den. 426 *U. S.* 941, 96 *S. Ct.* 2663, 49 *L. Ed.* 2d 394 (1976). Even with respect to quasi-legislative action in the nature of administrative rate-making, however, our courts have generally insisted upon a level of agency performance more exacting than that which merely escapes the taint of caprice or arbitrariness. *Permian Basin Area Rate Cases, supra,* 390 *U. S.* at 790–792, 88 *S. Ct.* at 1372–1373, 20 *L. Ed.* 2d at 349–350 ; *Public Service Coordinated Transport v. State, supra* 5 *N. J.* at 223 ; *In re Plainfield Union Water Co.,* 57 *N. J. Super.* 158, 167–168 (App. Div. 1959).

We should not in this case retreat to the less discriminating standard of review embraced by the concept of arbitrary and capricious action. There should be applied the time-tested precepts of judicial review of administrative action, that agency action proceed upon an evidential foundation and that the grounds of decision be fully revealed, see, *e. g., In re Heller,* 73 *N. J.* 292, 309 (1977) ; *Mayflower Securities Co. v. Bureau of Securities,* 64 *N. J.* 85, 92–93 (1973) ; *State v. N. J. Bell Tel. Co., supra* 30 *N. J.* at 29–30, 34 ; *Central R. Co. v. Department of Public Utilities, supra* 7

N. J. at 260–264; N. J. Bell Tel. Co. v. Communications Workers, 5 N. J. 354, 375–379 (1950); Public Service Coordinated Transport v. State, supra 5 N. J. at 223.

In confirming this judicial approach to the review of agency proceedings under the Health Care Facilities Planning Act, it is important that the courts be mindful that the problems of providing health care services and facilities are complex and controversial and that the Legislature has seen fit to commit the effectuation of the public policy in this area to the judgment of administrative specialists. The discretion delegated to the administrative experts must be accorded ample range and flexibility to fulfill the Legislature's expectations and to accomplish the objectives of the legislative program. Cf. Vermont Yankee Nuclear Power Corp. v. National Resources Defense Council, Inc., 435 U. S. 519, 524, 543–544, 98 S. Ct. 1197, 1202, 1211–1212, 55 L. Ed. 2d 460, 467, 479–480 (1978); Kleppe v. Sierra Club, 427 U. S. 390, 412, 96 S. Ct. 2718, 2731, 49 L. Ed. 2d 576, 591–592 (1976); In re Redi-Flo Corp., 76 N. J. 21, 34–35 (1978); New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N. J. 544, 562–563 (1978). As expressed in Permian Basin Area Rate Cases, supra, 390 U. S. at 776, 88 S. Ct. at 1364, 20 L. Ed. 2d at 341, "* * * the width of administrative authority must be measured in part by the purposes for which it was conferred."

In this frame of reference, agency determinations should be sustained by courts on review if they are supported in the record by evidence which can fairly be regarded as adequate and reliable, taking into account the purposes of the governmental effort, the nature of the administrative function, the complexity of the subject matter, the type and quality of evidence customarily available in the health care field, and the need for administrative expertise in resolving controversies and effectuating the policies of the statute. In view of the significance and importance, as well as the newness, of the governmental action in this area, the grounds upon which the administrative agency has acted, its reasoning, and the

manner in which the evidence of record has been transmuted into ultimate conclusions should be clearly disclosed and carefully explained. *Cf. SEC v. Chenery Corp.*, 332 *U. S.* 194, 196–197, 67 *S. Ct.* 1575, 1577, 91 *L. Ed.* 1995, 1999 (1947); *Eastern Central Motor Carriers Assoc. v. United States*, 321 *U. S.* 194, 205–212, 64 *S. Ct.* 499, 505–508, 88 *L. Ed.* 668, 677–680 (1944). See generally, Stewart, *"Vermont Yankee* And the Evolution of Administrative Procedure", 91 *Harv. L. Rev.* 1805 (1978); Byse, *"Vermont Yankee* and the Evolution of Administrative Procedure: A Somewhat Different View", *Id.* at 1823; K. Davis, *Administrative Law Treatise*, ch. 6, §§ 6:35–6:37 (2d ed. 1978).

These guiding principles lead, I respectfully suggest, to the conclusion that the determination of the Commissioners in this case was essentially correct. Giving full respect to the agency expertise, the Court can be satisfied that the administrative decision was based on reliable evidence demonstrating that Kessler's projected costs for its emergency room facility and newborn nursery were presumptively unreasonable in accordance with the regulatory criteria of the Departmental Guidelines and that the hospital had not produced countervailing proofs sufficient to overcome that presumption or establish the reasonableness of these costs. Nevertheless, it is proper to point out that the agency decision did suffer from a failure to explain adequately the factual basis and criteria it applied for its rejection *in toto* of the hospital's request for increased costs for the operation of its emergency room facility. I join the majority, therefore, in sustaining the agency determination with respect to the costs relating to the newborn nursery facility but in requiring a remand to reconsider the budget request for the emergency room facility.

### III

Since we have concluded, under the appropriate standard of judicial review, that the agency has not explained the basis for its determination with respect to the emergency

care budget request, some further observations may be of assistance on the remand.

Kessler contended, apart from the reasonableness of the actual costs of operations, it was unfairly compared with other hospitals which were not providing the same high quality emergency medical services as it was doing in optimum or maximum compliance with departmental regulations. In projecting this argument, the hospital appears to be quarreling in part with the operative regulations of the Guidelines themselves. Its contentions, so understood, were improperly raised and improvidently considered by the court below. 154 *N. J. Super.* at 154.

Under the Health Care Facilities Planning Act, the Commissioners of Health and Insurance, as noted, had been charged with the responsibility of approving for "reasonableness" the reimbursement rate paid by hospital service corporations to hospitals and other health care facilities. It is expressed, as a matter of strong legislative policy, that

hospital * * * services of the highest quality, of demonstrated need, efficiently provided and properly utilized at a reasonable cost are of vital concern to the public health.
[*N. J. S. A.* 26:2H–1].

This Court has already determined that these standards are sufficiently definite to guide the Commissioners in their exercise of the rate-review authority delegated under the Health Care Facilities Planning Act. *Borland v. Bayonne Hospital,* 72 *N. J.* 152, 158, *cert.* den. 434 *U. S.* 817, 98 *S. Ct.* 56, 54 *L. Ed.* 2d 73 (1977).

The Commissioners had determined to exercise their delegated powers to achieve the "reasonable cost" goal of the Act by instituting a rate-review program that defines the "reasonableness" of hospital costs for a particular service in terms of group norm costs incurred for the service by "com-

parable" providers.[4] Cost-benefit concerns are integral to "reasonable cost", as emphasized in the policy declaration of the Act,[5] and, as petitioners assert, cost-containment is central to the concept of "reasonable cost". "The pivotal mechanism * * * for controlling costs * * * is the prospective basic rate for routine services as determined by the use of hospital comparison groups and previous hospital experience." *S. Law, Blue Cross: What Went Wrong* (1974) 106 (discussing the New York plan).

By asserting that its peers were not truly comparable because of the "diversity * * * as to how each hospital organizes and manages its particular activities * * *", in effect Kessler was seeking to secure an individualized review of its budget. This approach to peer comparison, however, has already been rejected:

---

[4]A fundamental assumption of the regulatory approach adopted in New Jersey and other states that have enacted programs of partial economic regulation to contain escalating health care costs has been that inappropriate incentives in the third-party reimbursement mechanism have been a major cause of inflation in the hospital industry. See generally, Weiner, " 'Reasonable Cost' Reimbursement for In-patient Hospital Services Under Medicare and Medicaid: The Emergence of Public Control", 3 *Am. J. L. & Med.* 1 (1977); Enthoven, "Consumer-Choice Health Plan I", 298 *New Engl. J. Med.* 650 (March 23, 1978); Havighurst, "Health Care Cost-Containment Regulation: Prospects and an Alternative", 3 *Am. J. L. & Med.* 309 (1977). The "reasonable cost" concept implied in state hospital rate-regulation programs is constrained by a variety of factors, notably economy, measured in terms of the entire system, of the costs of comparable providers, and of the hospital's own internal efficiency. See, *e. g.*, Weiner, *supra.*

[5]The statute, as recently amended, emphasizes the responsibility of the Department of Health to further the "State's policy with respect to health . . . care facility cost containment programs" and the legislative goal to "contain the rising cost of health care services" as well as to "promote the financial solvency of hospitals and similar health care facilities". *N. J. S. A.* 26:2H–1, as amended *L.* 1978, *c.* 83.

The Guidelines do not assume that hospitals are so similar as to be identical; they do not recognize cost differences between and among hospitals, and the statistical comparisons represent as reasonable an approach to relating costs to services offered as is presently possible.

[*Goldmann Report* at 32].[6]

*Cf. E. I. du Pont de Nemours & Co. v. Train,* 430 *U. S.* 112, 126–133, 97 *S. Ct.* 965, 974–977, 51 *L. Ed.* 2d 204, 216–220 (1977); *Permian Basin Area Cases, supra,* 390 *U. S.* at 768–769, 88 *S. Ct.* at 1360–1361, 20 *L. Ed.* 2d at 336–337; *FPC v. Texaco,* 377 *U. S.* 33, 44, 84 *S. Ct.* 1105, 1112, 12 *L. Ed.* 2d 112, 119 (1964).

Moreover, the evidence of alleged improper peer grouping, as applied in this case, was slight. If a hospital were allowed, on such an insubstantial showing, to contest the peer group comparison in a rate-review hearing, the administrative proceeding could well become unmanageable. Furthermore, the hospital is not deprived of its opportunity to contest factually the agency rejection of its budget request and to justify by independent proof the reasonableness of the additional costs it seeks.

It is important in assessing the strength of the hospital's attack upon the application of the peer group mechanism to remember that the Department is not engaged in rate-making as such. It is administering a cost-containment program relating not to the establishment of a fair rate of return but solely to reimbursement rates applicable to patients covered by hospital service corporations. The hospital is not deprived

---

[6]Inherent in the peer comparison approach is "[t]he assumption * * * that, with regard to routine costs, there should be no significant deviations among comparable providers. Holding constant those criteria which account for significant deviations (size, location, and so on), in the absence of extraordinary circumstances, any major difference would relate to the efficiency of the hospital's operations. * * * The system provides an incentive to hospitals to reduce routine costs toward the group norm." Weiner, *supra,* 3 *Am. J. Law & Med.* at 25.

of its managerial prerogatives to set rates for other patients, nor is it threatened with the unconstitutional loss of property. Compare *In re Intrastate Industrial Sand Rates,* 66 *N. J.* 12, 23–24 (1974); *In re New Jersey Power & Light Co.,* 9 *N. J.* 498, 535 (1952); *Atlantic City Sewerage Co. v. Board of Public Utility Comm'rs.,* 128 *N. J. L.* 359, 367–371 (Sup. Ct. 1942), aff'd o. b. 129 *N. J. L.* 401 (E. & A. 1943). Accordingly, I agree with the Court that, while the Commissioners should not have omitted to refer to this particular argument of the hospital concerning the unfairness of the basic peer grouping, this failure was not significant and need play no part in the remand proceedings.

Kessler also argues that its actual costs for the emergency room operations were predicated upon its compliance with departmental regulations and consequently these costs must be deemed "reasonable" and allowable for reimbursement purposes.

It cannot be overstressed that the policy declaration of the Act emphasizes cost-efficiency as much as quality. *N. J. S. A.* 26:2H–1. Read carefully, it adjures that the "vital concern" to the State is only those high quality health care facilities and services that are needed, efficiently provided, properly utilized and reasonably priced. By implication, the State is not concerned with encouraging quality health care that is unneeded, inefficiently provided, underutilized, and not reasonably priced. The paramount objective of the Act is to promote only those "highest quality" health care services that are justifiable in a cost-benefit sense. The certificate of need program accomplishes this goal by placing a direct check on proposed expansion programs. *N. J. S. A.* 26:2H–7 to 11. The rate-review program, *N. J. S. A.* 26:2H–5,–18, attempts to achieve this goal through the more difficult process of manipulating and influencing the incentives in the third-party reimbursement mechanism so that health care providers are rewarded for cost-efficient and penalized for cost-extravagant behavior.

To the extent operating costs reflect the cost of compliance with departmental regulations governing the quality of health care, they must be assayed within the cost-containment framework of the regulatory scheme. When cost-of-compliance is tendered in a rate-review proceeding to justify a budget increase, the agency is entitled to demand substantial or persuasive proof from the hospital that these costs in fact are compelled and constitute the necessary, unavoidable and irreducible costs of compliance.

It does not appear that Kessler marshalled persuasive proofs on this issue. The language of the departmental regulation governing emergency medical services, *N. J. A. C.* 8:43 B–1.11 ,(q) (7) (ii), does not mandate that there be licensed physicians on emergency medical duty 24 hours every day. The departmental enforcement of that regulation does not reflect such an interpretation or application. The actual practice among comparable hospitals reveals different levels of adherence to the regulation and the testimony at the hearing demonstrates an administrative understanding that does not demand the kind of overfulfillment of the regulatory standard undertaken by Kessler. Equally unconvincing is the hospital's position that it was compelled by the Department, through a field representative, to comply with the emergency care regulation at this very costly level. The field representative merely cited Kessler for a deficiency because it had been using interns in the emergency room; she did not insist that deficiency be rectified by the hiring of full-time, 24-hour-per day, licensed physicians. Moreover, she herself did not understand that the regulation called for this saturated implementation and her own experience in the field with respect to emergency room facilities indicated that much more modest modes of emergency room operations were employed by most hospitals. Additionally, the hospital was dealing not with a supervisor or superior administrator in the licensing division but only with a field representative with respect to a deficiency arising out of a single incident.

And, though it may have overreacted at first to the deficiency citation, the hospital learned promptly upon the initial rejection of its emergency room budget request that its proposed method of compliance would not be regarded as a satisfactory, cost-efficient way to comply with departmental standards for furnishing emergency care services.

It would appear that the Commissioners were entitled on this record to consider that the hospital had not overcome the regulatory presumption of unreasonableness with respect to its requested emergency room operating costs. We are unenlightened, however, as to whether they so viewed the evidence before them. No findings were made or conclusions drawn to indicate that such a determination was reached. Furthermore, no attention was paid to the hospital's claim that it had no available alternatives in furnishing emergency medical care. It is entirely appropriate therefore that the agency on remand address the issue of costs of compliance and whether the hospital has made a sufficient evidential showing by substantial and persuasive evidence. Moreover, if in the judgment of the agency there has been a failure of proof, attention should be focused on whether some portion of the requested budgetary increase should be allowed as reasonable to the extent such increased costs are realistically attributable to overcoming deficiencies and improving the quality of emergency care services subject to the cost-containment considerations of the Act.

Justice MOUNTAIN joins in this opinion.

PASHMAN, J., dissenting. The majority today holds that William B. Kessler Memorial Hospital (Kessler) will not be reimbursed for certain 1976 expenditures made in connection with its new-born nursery facilities. It also concludes that a remand is required in order to determine whether Kessler's efforts to secure reimbursement for expenses attributable to its emergency center will suffer a similar fate.

I cannot subscribe to these results. In my opinion, Kessler's decisions to incur the challenged expenses were

entirely reasonable given the circumstances here involved. The funds at issue were expended in good faith by the hospital in reliance upon regulations of the Department of Health and directives of the Department's employees. Reimbursement was retroactively disallowed at the end of the year. The hospital should not now be penalized by having these costs excluded from the calculation of its 1976 per diem reimbursement rate. I therefore dissent from the holding which the majority has reached.

# I

## The Act

The Health Care Facilities Planning Act, *N. J. S. A.* 26 :2H–1 *et seq.,* declares that:

\* \* \* hospital . . . services of the highest quality, of demonstrated need, efficiently provided and properly utilized at a *reasonable* cost are of vital concern to the public health.

[*N. J. S. A.* 26 :2H–1 (emphasis supplied)]

As in effect in 1976,[1] that Act directed the Commissioner of the Department of Health (DOH), in consultation with the Commissioner of Insurance, to, *inter alia,* "certify the

---

[1]Subsequent to the occurrence of the events here at issue, the Legislature passed an amendment to the Act. *L.* 1978, c. 83. Although the focus of the Act remains that of containing the costs of health care services, the amendment has modified both the criteria to be utilized in determining the permissibility of cost reimbursement as to particular items and the body charged with review of hospital costs. Henceforth, a new entity designated as the Hospital Rate Setting Commission will have primary responsibility for determining the rates at which health care facilities will be reimbursed by hospital service corporations. *N. J. S. A.* 26 :2H–4–.1. Further, the reasonableness of costs incurred by a hospital will be gauged in terms of a "preliminary cost base" and a "certified rate base." *N. J. S. A.* 26 :2H–2k, –2l; 26 :2H–18; 26 :2H–18.1. This amendment has prospective effect only and is therefore inapplicable to the facts of the present case.

costs of providing health care services," *N. J. S. A.* 26:2H–18(c), and to "approv[e] *as to reasonableness*" the rates at which hospital service corporations (*i. e.,* Blue Cross) would reimburse health care facilities, *N. J. S. A.* 26:2H–18(d) (emphasis supplied). Further, no hospital could expand its facilities without obtaining a certificate of need from the Commissioner of Health who had to consider, *inter alia,* the availability of alternate services, availability of sufficient manpower, and possible economies and improvements in services to be anticipated from the operation of joint central services. *N. J. S. A.* 26–2H–7, –8. Finally, no hospital could be operated without obtaining a license from the DOH which was conditioned on the hospital's adoption of a uniform system of cost accounting, reports and audits. *N. J. S. A.* 26:2H–12, *N. J. A. C.* 8:31A–1.1 *et seq.*[2]

The focus of the Act was thus upon the "reasonableness" of particular expenditures made by a hospital — not only as to the rate which could be charged Blue Cross but also as to the need for new facilities to serve the public.[3] By deciding that no expenditures should be permitted for a particular service, the Department of Health could have effectively closed down a facility due to the absence of a public need. Clearly, the Department of Health was vested with fairly comprehensive regulatory control over hospitals to administer the State's health policy.

In the present case, DOH ruled that the two challenged expense items were "unreasonable" and hence disallowed

---

[2]The requirements that hospitals obtain certificates of need from the Commissioner of Health prior to the expansion of facilities and that they adopt a uniform system of accounting as a condition to licensing have not been changed by the recent amendment to the Act. See *N. J. S. A.* 26:2H–7, –8, –12.

[3]Under the new amendment to the Act, the standard of reasonableness is retained, although the method by which the reasonableness of particular expenditures is to be determined has been altered. *See* note 1, *supra.*

reimbursement. A review of the events leading to Kessler's incurring of these costs and the manner in which the Commission calculated its rates clearly shows that the Commissioner's determination cannot be sustained. Hence, her judgment should be reversed.

## II

### Fixing the 1976 Rate

To carry out their rate setting functions, the Commissioners of Health and Insurance promulgated guidelines after extended hearings before retired Judge Sidney Goldmann who had been specially designated to hear that matter. Rates were to be set annually and prospectively. All hospital costs were allocated to eight general functional categories and within those categories to various cost centers. The emergency room was a cost center in the general category of Outpatient Care. *N. J. A. C.* 8:31A–2.3(a)1. New-born nursery was a cost center in the Inpatient Care classification. *N. J. A. C.* 8:31A–2.2(a)3. Cost centers of comparable hospitals are grouped, and the median cost served as the base from which the reasonableness of a proposed charge was determined.[4] This method of calculating rates by use of peer groupings is practical and permissible provided that a hospital may seek and obtain relief from the disallowance of expenses to which it may be entitled. *Compare Permian Basin Area Rate Cases,* 390 *U. S.* 747, 88 *S. Ct.* 1344, 20 *L. Ed.* 2d 312 (1968).

As stated above the rate making scheme contemplated that rates would be fixed annually in advance. This accords with the general policy that rates should be set prospectively. The specific method followed for determining the 1976 rates

---

[4]The newly established Hospital Rate Setting Commission, *see* note 1, *supra*, has not as of yet promulgated guidelines to be utilized in determining the reasonableness of costs incurred by hospitals in future years.

was prescribed by DOH guidelines which were promulgated in October 1975 for the 1976 Hospital Rate Review Program. Under the guidelines hospitals submitted their proposed 1976 budgets, their 1975 budgets and actual 1975 costs. A DOH analyst then suggested proposed rates in each cost center, any one or more of which the hospital need not accept. The hospital had 30 days to appeal the analyst's determination and present its position before a hearing examiner. After the hearing officer had filed his report, the Commissioners of Health and Insurance "determine[d] and approve[d] the final administrative rate." The guidelines limited the bases upon which the Commission could adjust final rates to five specific reasons, including volume variances, actual measured inflation of supplies and some economic factor items improperly excluded. No adjustment could be made for any other errors or mistakes in the rate making process and there was no allowance for regulatory lag or indecisiveness by DOH in interpreting its own regulations.

In this case hearings on Kessler's appeal were not held until July 20, 1976. The undated Hearing Examiner's report was not issued until September 22, 1976 and the State Commissioner of Health related her concurrence in the Hearing Examiner's findings by letter dated December 10, 1976. The 1976 final administrative rate was set in a letter by the Commissioners of Health and Insurance dated December 13, 1976. By that time, of course, Kessler had in good faith expended the monies questioned herein for medical care in its emergency room and new-born nursery.

## III

### Emergency Center Costs

Kessler is located in a rural area on the outskirts of Hammonton, New Jersey. It is, however, situated near major highways carrying traffic to and from the Philadelphia metropolitan area and the New Jersey resorts of Atlantic City, Ocean City, and points south. Moreover, it constitutes

the only hospital within a 20-mile radius. Hence, a significant number of patients — mostly victims of automobile accidents — are treated in Kessler's emergency room.

Prior to 1975 Kessler staffed its emergency room with interns — *i. e.,* non-licensed physicians — at a salary of $4.70 per hour. These interns divided their time between the emergency center and other hospital departments, including obstetrics, pediatrics, the new-born nursery, and the out-patient clinic.

In November of 1974, Mrs. Lydia Pabian — a DOH field representative — inspected Kessler's emergency facilities in response to a complaint that an alleged rape victim had been unable to receive emergency treatment from a licensed phy-sician. Mrs. Pabian cited the hospital for a violation of a state licensing regulation providing that:

[a]ll hospitals shall provide 24-hour licensed physician coverage in the emergency department according to a plan established by the medical staff and/or approved by the governing board. There shall be a licensed physician responsible for the prompt and efficient treatment of all emergency patients[.]
[*Manual of Standards for Hospital Facilities, N. J. A. C.* 8:43B–1.11(q)(7)(ii)]

Pabian told Kessler officials that pursuant to the regulation, the hospital "had to have twenty-four hour licensed physicians in the emergency room." She further stated that compliance could not be achieved by using doctors who doubled as resident physicians for in-house patients, since the prime concern of an emergency room physician had to be the emergency room. Finally, she informed Kessler that exceptions to this rule would be made only in the case of hospitals with a very low volume of emergency patients (less than 6,000 per year). Kessler's annual emergency room visits were in excess of 11,000.

In order to comply with the licensing regulation as "construed" by Mrs. Pabian, Kessler discontinued its intern program in July 1975 and hired full-time licensed physicians

whose sole responsibility was to provide around-the-clock
emergency room coverage. These physicians were paid at a
rate of $18.50 per hour. As a result Kessler's annual emer-
gency center physician costs increased from $47,000 to
$200,000.

At the hearing below, on July 20, 1976, Dr. Solomon Gold-
berg — DOH's Director of Licensing Certification, and
Standards for Health Facilities — maintained that, contrary
to Kessler's belief, the regulation at issue did not require
that licensed physicians be present in the emergency room
at all times. Although such a state of affairs might be "op-
timal," he contended that around-the-clock physician presence
was "not a mandate." Instead, all that was required was a
plan to provide 24-hour emergency room *coverage*. So long
as a licensed physician was at all times able to reach the cen-
ter within five minutes of an emergency, this requirement
would be satisfied.

The Hearing Examiner, on September 22, 1976, found
that Dr. Goldberg's construction of the relevant regulation
was the proper one. As a result, he concluded that $124,871
of the increased costs incurred by Kessler to comply with the
regulation were unnecessary, and hence unreasonable. He, as
does the majority, deemed it irrelevant that these expendi-
tures were made in reliance upon Mrs. Pabian's admonish-
ments.

Whether the correct interpretation of the regulation at is-
sue is that propounded by Dr. Goldberg or that espoused by
Mrs. Pabian in 1974 is irrelevant to the proper disposition of
this case. What is important is that Kessler acted *reasonably*
at the time in incurring the increased emergency room costs.
The regulation on its face is ambiguous as to whether around-
the-clock physician presence in the emergency room is re-
quired. The ambiguity was apparently cleared up — from the
hospital's standpoint — by Mrs. Pabian's statements in 1974.
To now label "unreasonable" a cost incurred in direct re-
sponse to a DOH representative's construction of an am-
biguous regulation penalizes Kessler for attempted good faith

compliance with DOH quality standards. What is "unreasonable" is to expect that Kessler should have acted otherwise.

Finally, a few words must be said concerning the propriety of the "peer group" comparison to which Kessler was subjected. Kessler's emergency room expenditures were initially singled out as "presumptively unreasonable" because these costs exceeded the median emergency center costs incurred by Kessler's peer hospitals. At the hearing below, Mrs. Pabian testified that of the eleven hospitals in Kessler's peer group two did not have emergency rooms; one had an emergency room but did not provide for 24-hour coverage; and one was only in the process of instituting 24-hour coverage. All four of these hospitals were thus in violation of state licensing regulations. *See N. J. A. C.* 8:43B–1.11(q)(7).

While the majority may be correct in pointing out that no two hospitals will ever be identically situated, see *ante* at 571 –572, it is somewhat absurd to compare the emergency room costs incurred by Kessler to man an around-the-clock center with those incurred by hospitals lacking an emergency center. And yet the Hearing Examiner never responded to Kessler's contentions that these members of its peer group were not comparable insofar as emergency room costs were concerned. In refusing to consider these claims, the Hearing Examiner acted arbitrarily and unreasonably. It should be noted that apart from these proceedings Kessler had no opportunity to question the peer groupings utilized for this cost center. To foreclose that opportunity may well infringe on its due process rights.

IV

*New-Born Nursery Center Costs*

As with the challenged emergency room costs, the $12,000 in expenditures made in connection with Kessler's new-born nursery derived from the hospital's attempt to comply with state licensing regulations. Moreover, its decision to incur these costs was entirely reasonable given the circumstances here involved.

In 1973–1974 four obstetricians joined Kessler's staff. As a result of the new patients they referred to the hospital, births and new-born patient days increased dramatically. In 1975 and 1976, however, these four physicians resigned, precipitating a 400-day decrease in annual patient days. At the time of the hearing below, approximately 300 deliveries a year were being made at Kessler. The hospital's new-born facilities were therefore underutilized.

Irrespective of this underutilization, state standards required the hospital to provide full-time registered nurse coverage in its nursery facilities. The applicable regulation, *N. J. A. C.* 8:43B–8.4, provides:

(a) Separate personnel shall be assigned to the obstetrical service which shall be under direct supervision of a registered professional nurse at all times. If the caseload does not justify the total time of one nurse on each tour of duty, exception may be made by action of the hospital licensing board after submission and approval of written techniques. In the event that exception is granted, such techniques shall be posted in the obstetrical unit and all personnel instructed.

(b) There shall be at all times, day and night, registered professional nurse supervision of the nursing care of mothers and infants, and such other nursing supervision and coverage as is required.

\*        \*        \*        \*        \*        \*        \*        \*

As soon as Kessler realized that it had overestimated the number of 1976 births (due to the unforeseeable resignation of four obstetricians), it tried to increase its "delivery rate" and "occupancy rate" by seeking to attract new physicians to the OB/GYN Department. The hospital—in order to minimize costs while the nursery was underutilized—also petitioned DOH for an exemption from the registered nurse requirement of subsection (a) of the above regulation. This request was denied. Finally, when Kessler's 1976 efforts to increase the delivery rate proved unsuccessful and it was apparent that the hospital's new-born center would remain underutilized during the foreseeable future, Kessler officials discontinued the nursery department.

The Hearing Examiner found, however, that had Kessler so requested, DOH—due to the low number of births in the hospital—would have relaxed the requirements of subsection (b) of the above regulation and allowed Kessler to utilize licensed practical nurses instead of registered nurses in its new-born center. Hence, he concluded that Kessler had unreasonably expended $12,000 in order to secure the services of registered nurses.

The Hearing Examiner's conclusions in this regard fail to withstand close scrutiny. First, the "nursery" subsection of the relevant regulation, unlike subsection (a), does not indicate that its requirements can be relaxed by DOH officials. The Hearing Examiner's conclusions are thus premised upon an "unwritten" exception to DOH regulations. A hospital should not be penalized because its officials are not fully cognizant of every *unwritten exception* to the written regulations. If DOH wishes to provide exemptions to certain of its requirements, the wording of the regulation should clearly indicate that such exemptions are available.

More importantly, Kessler would not have qualified under this unwritten exception even had it requested a relaxation of the regulations. Testimony below demonstrated that DOH would allow licensed practical nurses to be substituted for registered nurses only if there were no more than two babies in the nursery at any one time. Although Kessler averaged only 300 births per year, these births were not evenly spaced. Surveys revealed that the hospital's nursery population varied from one to four babies.

The picture that emerges is one in which Kessler officials acted reasonably in the face of unforeseeable events. When 1976 birth projections proved erroneous due to staff resignations, the hospital attempted to attract new physicians as well as keep its new-born costs at the lowest level permissible under state regulations. As soon as Kessler realized that underutilization could not be remedied, it abandoned its facilities.

Kessler should not now be penalized by having $12,000 excluded from the calculation of its 1976 per diem reimbursement rate. Hospital officials are not infallible and, as a result, birth projections are often erroneous. The most that one can expect is that when an error is discovered, officials will deal with the situation in as reasonable a manner as possible.

## V

### *Conclusion*

One of the goals underlying the Health Care Facilities Planning Act is that of insuring that hospitals are run as efficiently as possible without a decrease in the quality of medical treatment. As such, under the Act "unreasonable" expenditures made by hospitals are not to be reimbursed by hospital service corporations. In the present case Kessler acted in an entirely reasonable manner when incurring the two challenged cost items. I would therefore hold that the hospital is fully entitled to reimbursement.

Justice SCHREIBER joins in this opinion.

MOUNTAIN and HANDLER, JJ., concurring in the result.

*For reversal and remandment*—Chief Justice HUGHES and Justices MOUNTAIN, SULLIVAN, CLIFFORD and HANDLER—5.

*For affirmance*—Justices PASHMAN and SCHREIBER—2.

