180 N.J. Super. 324 (1981)
434 A.2d 1111
IN THE MATTER OF THE APPLICATION OF BOARDWALK REGENCY CORPORATION FOR A CASINO LICENSE.
Superior Court of New Jersey, Appellate Division.
Argued January 20, 1981.
Decided July 21, 1981.
*330 Before Judges FRITZ, POLOW and JOELSON.
William R. Glendon, of the New York Bar, argued the cause for applicant-appellant Boardwalk Regency Corporation and appellants Caesars World, Inc. and Caesars New Jersey, Inc. (Wilentz, Goldman & Spitzer, attorneys; Morris Brown and Brian J. Molloy, of counsel; and Rogers & Wells, New York City, attorneys; William R. Glendon, Guy C. Quinlan, John H. Carley and Robert A. Rabbino, Jr., of counsel).
Irving Younger, of the New York Bar, argued the cause for appellants Clifford S. Perlman and Stuart Z. Perlman (Pitney, Hardin & Kipp, attorneys; Clyde A. Szuch, Murray J. Laulicht, Marc S. Klein and Stuart M. Feinblatt on the brief; and Williams & Connolly, Washington, D.C., attorneys; Edward Bennett Williams, Harold Ungar and Robert B. Barnett on the brief).
Michael R. Cole, Assistant Attorney General, argued the cause for respondent Attorney General of New Jersey (John J. Degnan, Attorney General of New Jersey, attorney; Michael R. Cole and Andrea M. Silkowitz and Anthony J. Parrillo, Deputy Attorneys General, on the brief).
The opinion of the court was delivered by FRITZ, P.J.A.D.
Following extensive investigation and formal hearings on the application of Boardwalk Regency Corporation (BRC) for a *331 plenary casino license, the Casino Control Commission (Commission) determined that BRC qualified except for the presence of Stuart Z. and Clifford S. Perlman, brothers with extensive interests in the operation. As a consequence, the grant of a plenary license was conditioned in effect on divestiture of any Perlman interest which had any capacity for exerting control over BRC or any related entity. These consolidated appeals by BRC, Caesars World, Inc. (CWI), Caesars New Jersey, Inc. (CNJ) and Stuart and Clifford Perlman challenge that ruling and the constitutionality of N.J.S.A. 5:12-89.
Direct and indirect Perlman interest in and influence upon the affairs of BRC and ample cause for the insistence of the Commission that it be persuaded of the qualification of each of the brothers as a "casino key employee" (N.J.S.A. 5:12-85 c and d) appear indisputably from the genesis of the corporation and are in fact not disputed.[1] BRC is a wholly-owned subsidiary of CNJ, 86% of the stock of which is in turn owned by CWI. A creature of humble beginnings, CWI was launched in 1956 when Stuart and Clifford Perlman purchased a "Lum's" restaurant, a small fast-food eating establishment that specialized in hot dogs steamed in beer. The purchase price was $25,000, "half down and the balance over three years." About 1965 the Perlmans started franchising the Lum's stores. Ultimately there were almost 400 of these restaurants in 30 or more states. Lum's was listed on the New York stock exchange in 1969.
1969 was also the year the Perlmans negotiated the purchase of Caesars Palace for 60 million dollars. In 1971 the recession in the restaurant business and the need of the growing Caesars Palace for money produced the sale of the restaurants and the change of the corporate name to Caesars World.
*332 Today CWI is listed on the New York and Pacific Coast stock exchanges. Its 26,100,000 shares of outstanding stock are owned by 70,000 shareholders. Consolidated revenues approximate a half billion dollars annually. Clifford Perlman, chairman of the board and chief executive officer of CWI, owns approximately 10% of the outstanding stock. His brother Stuart owns about 8% of the stock of CWI and holds the position of vice-chairman of the board of directors.
At the conclusion of the hearings the Commission noted, with respect to one of the individuals in the corporate structure who was found to be qualified: "As in all areas of human endeavor, there is in the regulatory process never a situation absent some scintilla, some particle of doubt." Nevertheless, it found qualified for a license the corporation and all the persons required to qualify by N.J.S.A. 5:12-85 c and d, except Clifford and Stuart Perlman. Upon clearly articulated findings and for reasons expressed at length, it announced that it was unable "to find by clear and convincing evidence that Clifford Perlman possesses the good character, honesty and integrity demanded by the Casino Control Act," and that "BRC has failed to meet the affirmative responsibility of establishing the good character, honesty and integrity of Stuart Perlman." The substance of the consequent order was that the application of BRC for a license would be granted but only upon the conditions that
... both Clifford and Stuart Perlman ... dispose of any interest whatsoever which either of them may hold in Caesars World, Inc., Caesars New Jersey, Inc. or in any and all subsidiary companies of Caesars World, Inc. in this or any other jurisdiction; ... both Clifford and Stuart Perlman be removed from any position as an officer, director or employee of Caesars World, Inc., Caesars New Jersey, Inc., Boardwalk Regency Corporation and any and all subsidiary companies of Caesars World, Inc. in this or any other jurisdiction; ... [and that] neither Clifford or Stuart Perlman shall receive any remuneration in any form, whether for services rendered or otherwise, from Caesars World, Inc., Caesars New Jersey, Inc., Boardwalk Regency Corporation, or from any other subsidiary company of Caesars World, Inc., in this or any other jurisdiction.
The order further provided for the submission of "a detailed plan and timetable for accomplishing the divestiture of all such securities and removal from all such positions."
*333 The Supreme Court "suspended" "the conditions imposed on the issuance of a license" pending "disposition of the pending appeals" here being considered.
At the outset we observe that all parties agree, as do we, that with respect to the factfinding by the agency our obligation is set and our privilege of independence is limited by Mayflower Securities v. Bureau of Securities, 64 N.J. 85 (1973). Basically we search to discover whether the findings of fact could reasonably have been reached on sufficient credible evidence present in the record, considering the proofs as a whole, with due regard for the opportunity of the Commissioners who heard the witnesses to judge of their credibility. Where expertise is a pertinent fact, we must accord due regard in that respect as well. We agree with a number of appellants' contentions in respect to these standards and others governing our review. First, this search does not require deference to the Commission respecting factual findings in any area in which those findings rest upon a determination as to worth, plausibility, consistency or other tangible considerations apparent from the face of the record, as to which the Commission is no more particularly situated to decide them than are we. See Dolson v. Anastasia, 55 N.J. 2, 7 (1969). Second, it is beyond cavil that in the review function the whole record must be considered. As is expressly pointed out in Mayflower, supra:
... The appellate application of this standard [i.e., that of Close v. Kordulak Bros., 44 N.J. 589, 599 (1965)] requires far more than a perfunctory review; it calls for careful and principled consideration of the agency record and findings in the manner outlined in State v. Johnson, 42 N.J. 146, 161-162 (1964). [64 N.J. at 93]
We also concur that we are "in no way bound" by the agency's interpretation of a statute or its determination of any strictly legal issue. Mayflower, supra, at 93. Finally, the requirement that we defer to the expertise of the agency is only as compelling as is the expertise of the agency, and this generally only in technical matters which lie within its special competence. N.J. Bell Tel. Co. v. State, 162 N.J. Super. 60, 77 (App. *334 Div. 1978). Where, as is apparently the case here, expertise has not yet developed by experience or special training, no particular deference need be accorded the agency's findings of fact unless there are "demeanor credibility" factors. We do not suggest by this latter comment that special expertise exists in the determination of many nontechnical qualities or properties, such as good character, honesty and integrity. More times than not this type assay calls for the application of common sense and judgment, after credibility problems have been solved.
A careful review of the record in testing the findings is vital to the proper management of a government of laws, for a determination predicated on unsupported findings is the essence of arbitrary and capricious action. See Thomas v. Morris Tp. Bd. of Ed., 89 N.J. Super. 327 (App.Div. 1965), aff'd o.b. 46 N.J. 581 (1966); Morgan v. Saslaff, 123 N.J. Super. 35, 38 (App.Div. 1973). If we are satisfied after an application of the standards set out above that the findings of fact do not pass muster, we will not hesitate to reverse or remand, N.J.S.A. 5:12-110 c(3), or, inasmuch as the appeal is "in accordance with the Rules of Court," N.J.S.A. 5:12-110 a, make our own findings and draw our own conclusions. R. 2:10-5; State v. Johnson, 42 N.J. 146, 162 (1964).
On the other hand, if it appears that the findings might reasonably have been reached from sufficient credible evidence, we will not disturb them even in cases in which, had we been doing it, we would have done it differently. Proper respect for the obligation of the agency to accomplish its statutory obligations and consideration for implementation of the legislative intent in the manner designed by the Legislature causes us to proceed with especial restraint in agency matters. See New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 562-563 (1978). Our original factfinding authority must be exercised only with great frugality and in none but a clear case free of doubt. See Greenfield v. Dusseault, 60 N.J. Super. 436, 444 (App.Div. 1960), aff'd on majority opinion 33 N.J. 78 *335 (1960). A difference of opinion concerning evidential persuasiveness of relevant testimony certainly does not justify judicial interference. In re Howard Savings Bk., 143 N.J. Super. 1, 10 (App.Div. 1976). Factual findings of an administrative agency are generally sustained if they are supported by substantial evidence on the whole record. Atkinson v. Parsekian, 37 N.J. 143, 149 (1962).
We have gone to these lengths in explication of legal issues probably not the subject of any substantial disagreement between the adverse factions, in order that the parties might be expressly advised, at the outset, of the criteria we have employed in measuring appellants' challenges. Although we are tempted to begin with attention to the statute and appellants' broadside attacks on it, we are satisfied that exploration of the findings as a first effort, and of appellants' challenges with respect to these, will make more meaningful a later consideration of the legislative mandate.
As noted above, the conclusionary finding[2] of the Commission respecting both Perlmans was that it had not been persuaded by clear and convincing evidence that either of them possessed the good character, honesty and integrity required by the Casino Control Act to qualify for a license. The basic or evidentiary facts upon which this conclusion was founded included among others: Clifford Perlman's "repeated and enduring" relationship with one Alvin I. Malnik, "a person of unsuitable character and unsuitable reputation ... [who] associated with persons engaged in organized criminal activities, and ... [who had] himself participated in transactions that were clearly illegitimate and illegal," at times subsequent to the media identification of an alleged business connection between Malnik and Meyer Lansky, a reputed organized crime figure. It was stipulated that the CWI directors were told as early as July 1971 that *336 although Malnik, once indicted for tax fraud, had never been convicted of a crime, the "Federal law enforcement agencies apparently believed Malnik was involved in organized crime." The Commission found that the Malnik-Perlman association persisted long after Clifford Perlman's attention was called to the allegations of unsavoriness respecting Malnik's other friends. Indeed, it found that it persisted even after Philip Hannifan, chairman of the Nevada Gaming Control Board, had "voiced his concerns over Mr. Perlman's association with an individual of Mr. Malnik's reputation," and had received a commitment from Perlman "to extricate himself from the Cricket Club [one of the Perlman-Malnik associations] if Mr. Malnik would not institute a libel suit against Hank Messick, the author of Lansky."
Appellants' response is impassioned and zealous. They point to evidence that "[i]n 1972, when Clifford Perlman entered into the Cricket Club transaction, he had no reason to believe that there was any obstacle to his doing so.... [M]any other reputable individuals and financial institutions saw no problem at this time in associating with Malnik." They explain the continuance of the Cricket Club relationship by saying that "Perlman tried repeatedly to sever his connections with the venture, and subsequently did terminate his ties with the Cricket Club, after great difficulty and heavy personal financial sacrifice." They direct our attention to the fact that "In its eagerness to make its point, the Commission suppresses the testimony of Hannafin that he never took Perlman's expression of intent to get out of the deal as a commitment." Both briefs emphasize that Hannafin, no longer a Nevada official, testified he was satisfied with Perlman's efforts.
The foregoing is only one area of several which troubled the Commission. It is typical of the others. As is most certainly to be anticipated, a large portion of the testimony was susceptible not only of varying inferences but of varying conclusions. In like fashion, appellants point to substantial areas of testimony which are highly complimentary and praiseful of the Perlman brothers, most of it from business and banking.
*337 Appellants claim the Commission distorted the evidence. Whether by unintentional hyperbole or as a result of faithful (but we believe misplaced) conviction, they assert that the findings are "completely unsupported by the record." These things are just not so. The Commission chose between conflicts in evidence, conflicts in available reasonable inferences and conflicts in conclusions which might be drawn. This was not only their right, it was their duty. A careful review of the record convinces us that regardless of evidence to the contrary, the findings they reached were reasonably available on the whole record and we will not disturb those findings. Mayflower, supra.
With respect to the contention of Stuart Perlman that his disqualification, at least, resulted from "administrative afterthought" on a record where there is "virtually no evidence ... directed specifically against him," we say only that we are in hearty agreement with the conclusion of the Commission: "Stuart and Clifford Perlman are more than just brothers." We are persuaded, as was the Commission, that the affairs of the brothers are inextricably entwined. Parenthetically, we observe that judicious administrative afterthought may well be a salutary purpose of the administrative hearing. What one perceives to be "afterthought," another might regard as "careful consideration."
Appellants Perlman also complain of that which they characterize as a "procedural inadequacy" respecting the findings of fact. They claim that in marshalling its findings the Commission ignored (or at least was unconcerned with) "overwhelming evidence" of distinguished business careers and model corporate existence of praiseworthy propriety. Citing the concurring opinion of Justice Handler in In re Kessler Mem. Hosp. Reimbursement, 78 N.J. 564, 573, 578-579 (1979), they charge that the agency has failed to identify the evidence it found insufficient.
The Commission did not ignore the favorable testimony. Quantitating the supportive factual presentation in terms of "a great deal of evidence," it said:

*338 In an effort to meet its statutorily imposed burden, BRC produced a great deal of evidence in support of both the good reputation of Clifford Perlman and the good character, honesty and integrity of Clifford Perlman. Several witnesses testified as to Clifford Perlman's good reputation in the financial community, in the casino hotel industry and in the communities where he lives and works. Most of these witnesses also testified as to his good character, honesty and integrity. Suffice it to say that the Commission has very carefully examined, considered and weighed all of this evidence.
It also spoke of the evidence produced "in support of the qualification of Stuart Perlman all of which has been carefully examined, considered and weighed." The distinction between findings of proof and findings of nonproof or inadequate proof or proofs which are not creditable, and the consequent obligations of a reviewing court, are discussed in Kaplowitz v. K & R Appliances, Inc., 108 N.J. Super. 54, 61-62 (App.Div. 1969), certif. den. 55 N.J. 452 (1970).
We have no doubt at all respecting "the grounds upon which the administrative agency has acted, its reasoning, and the manner in which the evidence of record has been transmuted into ultimate conclusions." In re Kessler Mem. Hosp. Reimbursement, supra, Handler, J., concurring, 78 N.J. at 578-579. We are satisfied that these have been "clearly disclosed and carefully explained." Ibid. Indeed, it is the clarity of that explanation that convinces us the Commission assuredly heard what was being said by the financial community, the personal community and the industry favorable to the Perlmans. Despite this, the Commissioners believed the shortcomings to be in fatally critical areas. This is exemplified by a question posed in their opinion:
Once again, in the absence of any credible explanation presented in this record, we are left with a serious question. Why did Clifford Perlman, in late 1974, lead his company into its second (and his third) business entanglement with Alvin Malnik, especially in light of his November 1972 discussion with the Chairman of the Nevada Gaming Control Board?
In the conclusion implicit in this inquiry, and after an extraordinarily careful review of the record in view of the importance and novelty of the questions before us, we will not substitute our judgment for that of the agency. New Jersey Guild of Hearing Aid Dispensers v. Long, supra.
*339 Although the statute is discussed in greater detail below, we pause to note that the appellants Perlman at one point in their brief contend simply that the "Commission's findings do not support a bad character conclusion." Such a conclusion is unnecessary. The statutory burden to demonstrate affirmatively the qualifying attributes, whatever they might be, has been expressly and clearly placed on the applicant by the Legislature and is subject to the canon of clear and convincing evidence. N.J.S.A. 5:12-84, 5:12-89. It is not necessary to disqualification that the applicant or any personnel required to be qualified be of demonstrably bad character. Disqualification is justified by their failure to prove themselves qualified by clear and convincing evidence. Such evidence is that which "produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established," evidence "so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." Aiello v. Knoll Golf Club, 64 N.J. Super. 156, 162 (App.Div. 1960). Particularly in this sensitive field, N.J.S.A. 5:12-1 b(9); Bally Mfg. Corp. v. N.J. Casino Control Comm'n, 85 N.J. 325, 331 (1981), to doubt is most certainly to deny.
We turn our attention to the statute. The attack of appellants ranges wide. The brief filed by the corporate appellants, citing N.J.S.A. 5:12-1(b)(7) and the 1977 State Commission of Investigation Report and Recommendations on Casino Gambling, charges that "the statute's purpose is clear: it seeks to guard against any danger of infiltration by organized crime, and at the same time to protect applicants against being penalized for innocent associations." It then argues that the Commission decided the disqualification solely  although the brief does not use the word "solely," it is inescapably implied  "because of innocent associations wholly unrelated to the statutory purpose," thus having "misread, and impermissibly broadened, the statute."
*340 The argument is subtle, but unpersuasive. We agree entirely that the statute was intended to guard against any danger of infiltration by organized crime. This premise is too obvious to require further elaboration. It is probable as well that reasonable persons, including legislators, desire to shield corporations and individuals from penalty where the only offense is "innocent associations." But it is equally obvious to us that protection against criminal elements is not at all the only regulatory purpose of the statute. The second subsection after that cited by appellants reads:
Since casino operations are especially sensitive and in need of public control and supervision, and since it is vital to the interests of the State to prevent entry, directly or indirectly, into such operations or the ancillary industries regulated by this act of persons who have pursued economic gains in an occupational manner or context which are in violation of the criminal or civil public policies of this State, the regulatory and investigatory powers and duties shall be exercised to the fullest extent consistent with law to avoid entry of such persons into the casino operations or the ancillary industries regulated by this act.
[N.J.S.A. 5:12-1 b(9); emphasis supplied]
Clearly the Legislature did not intend to limit the power of disqualification only to situations presenting a danger of infiltration by organized crime, or as a matter of fact any other kind of crime. See N.J.S.A. 5:12-86.
As suggested above, we are not critical of a proposition denouncing guilt adjudication predicated solely on "unknowing or otherwise innocent association" and are sensitive to the difficulties defending against such a premise. Again we differ, however, with appellants' thesis that such a finding was the sole cause for disqualification of the Perlmans. For this purpose only, we will assume the impugned associations were either unknowing or innocent. Nonetheless, it is apparent from the clear findings of the Commission that it was obviously disturbed by such things as the then and later apparent insensitivity of the brothers to the potential impact of those associations upon the industry, those who regulate it, those who manage it, those who patronize it and the public in general. This sensitivity on the part of the Commission respecting the insensitivity on the part *341 of the Perlmans resides safely within the four corners of the statute where strict regulation is expressly mandated. The purpose for strict regulation is also expressly stated: "An integral and essential element of the regulation and control of such casino facilities by the State rests in the public confidence and trust in the credibility and integrity of the regulatory process and of casino operations." N.J.S.A. 5:12-1 b(6).
There is nothing inherently wrong with sensitive, strict regulation. It has for many years been exercised in this State in certain industries. Liquor, with "its inherent evils," has been dealt with as "a subject apart." Grand Union Co. v. Sills, 43 N.J. 390, 398 (1964). The legislative power to regulate such a "nonessential and inherently dangerous commodity," as a wholly constitutional expression of concern for public health, safety, morals or general welfare, has been said to be almost without limit. Id. at 403-404. Horse racing, with attendant legalized gambling, "strongly affected by a public interest," has been held to be a "highly appropriate" subject for close regulatory supervision, Jersey Downs, Inc. v. N.J. Racing Comm'n, 102 N.J. Super. 451, 457 (App.Div. 1968), a condition recognized as desirable for many years, Niglio v. N.J. Racing Comm'n, 158 N.J. Super. 182, 188 (App.Div. 1978). We see every reason, including those expressed in N.J.S.A. 5:12-1 b, for legalized casino gaming to take its deserved place among those industries. See Bally Mfg. Corp. v. N.J. Casino Control Comm'n, supra, 85 N.J. at 331. Twenty years before New Jersey enacted the Casino Control Act, Nevada, the home port of legalized gambling in the United States, pointed out at least one good reason for strict regulation. In Nevada Tax Comm'n v. Hicks, 73 Nev. 115, 310 P.2d 852 (Sup.Ct. 1957), the court declared:
For gambling to take its place as a lawful enterprise in Nevada it is not enough that this state has named it lawful. We have but offered it the opportunity for lawful existence. The offer is a risky one, not only for the people of this state, but for the entire nation. Organized crime must not be given refuge here through the legitimatizing of one of its principal sources of income. Nevada gambling, if it is to succeed as a lawful enterprise, must be free from the criminal and corruptive taint acquired by gambling beyond our borders. *342 If this is to be accomplished not only must the operation of gambling be carefully controlled, but the character and background of those who would engage in gambling in this state must be carefully scrutinized. [310 P.2d at 854]
For the reason there declared and for the several other reasons set forth in our statute, New Jersey, inspired by legislative fiat and common sense, must be as careful in the scrutiny of the character and background of those who would engage in gambling in this State as is Nevada there.
As Justice Handler recently observed in Knight v. Margate, 86 N.J. 374 (1981):
At the very heart of the public policy embraced by the new law is "the public confidence and trust in the credibility and integrity of the regulatory process and of casino operations." N.J.S.A. 5:12-1(b)(6). Related directly to this purpose, the Legislature stated that "the regulatory provisions .. . are designed to extend strict State regulation to all persons ... practices and associations related to" casinos and that "comprehensive law-enforcement supervision ... is further designed to contribute to the public confidence and trust in the efficacy and integrity of the regulatory process." Id. Because of the need for integrity, public confidence and trust, it was stressed that not only persons with criminal backgrounds and associations but also persons "deficient in business probity" should be excluded from casino gaming operations. N.J.S.A. 5:12-1(b)(7). In this vein, because casino operations "are especially sensitive and in need of public control and supervision," the statute dictates that "the regulatory and investigatory powers and duties shall be exercised to the fullest extent consistent with law to avoid the entry" into casino operations, directly or indirectly, of persons whose economic or occupational pursuits are violative of the "criminal or civil public policies of this State." N.J.S.A. 5:12-1(b)(9). These public policy objectives were augmented by later amendments which declared that even though "[c]ontinuity and stability in casino gaming operations" were important, these could not be achieved by allowing persons with "unacceptable backgrounds and records of behavior" to control casinos. N.J.S.A. 5:12-1(b)(15); L. 1978, c. 7, § 1. [at 381-82]
For these reasons, we disagree with the argument that the Commission "misread, and impermissibly broadened, the statute." We find no overreaching.
The Perlman brief challenges the statute and its application in two principal respects.[3] First, they insist that from the finding *343 of the Commission, couched as it is in terms of the failure of the applicant to prove by clear and convincing evidence the "good character, honesty and integrity" of the Perlmans, it is apparent that body has gone beyond the authority delegated and has disqualified the Perlmans on a ground not permitted by the statute, i.e., the failure to demonstrate the fact of their good character, honesty and integrity. The delegation, the Perlmans argue, is limited to an ascertainment of the reputation for good character, honesty and integrity. This argument is posited on a theory that the disqualifying factors set forth in N.J.S.A. 5:12-86 are so expressly inclusive otherwise that subsection "a" requires nothing more than literal compliance with N.J.S.A. 5:12-89.
Again we find the argument ingenious, for the latter statute does indeed refer to the "reputation for good character, honesty and integrity." However, we find it unpersuasive because it ignores the prime objective of statutory construction: the search for legislative intent. Safeway Trails, Inc. v. Furman, 41 N.J. 467, 477 (1964), cert. den. 379 U.S. 14, 85 S.Ct. 144, 13 L.Ed.2d 84 (1964). In such pursuit the intent is to be perceived from the whole statute, and all parts of the statute must be read so that they are in alignment with the intent of the entire act. Seatrain Lines, Inc. v. Medina, 39 N.J. 222, 226-227 (1963). The statute must be read mindful of the evil which it is designed to eliminate and of the proposed remedy. Brewer v. Porch, 53 N.J. 167, 174 (1969). Broad latitude is to be accorded the probable intent of the Legislature in this regard toward the end of best serving these beneficent purposes. Continental Cas. Co. v. Knuckles, 142 N.J. Super. 162, *344 167 (App.Div. 1976). Nor will we permit the intent of the Legislature to be subverted by language which, read literally, appears to contravene that which the Legislature actually intended. As we said in Continental Cas. Co. v. Knuckles:
First attention should go to the purpose of the legislation. "Where a literal rendering will lead to a result not in accord with the essential purpose and design of the act, the spirit of the law will control the letter." N.J. Builders, etc., Ass'n v. Blair, 60 N.J. 330, 338 (1972). It cannot be better put than as by Justice Heher in San-Lan Builders, Inc. v. Baxendale, 28 N.J. 148, 155 (1958), "Reason is the soul of law." [at 167]
Thus viewed, the Casino Control Act is obviously intended to disqualify those who cannot demonstrate the fact of good character, honesty and integrity. As we observed above, the preambulary declaration of policy establishes the objective of excluding those who as a matter of fact "have pursued economic gains in an occupational manner or context ... in violation of the ... civil public policies of this State." N.J.S.A. 5:12-1 b(9). No suggestion appears in this declaration that the facts supporting qualities inimical to the general and salutary purposes of the statute, once found, need be augmented by a further finding of a reputation for those qualities.
We acknowledge our responsibility not to ignore the words used by the Legislature, Hackensack Bd. of Ed. v. Hackensack, 63 N.J. Super. 560, 569 (App.Div. 1960), and, if possible, to harmonize the meaning of the statute so that no words or phrases are deemed inoperative, superfluous or meaningless. Abbotts Dairies v. Armstrong, 14 N.J. 319, 327-328 (1954). In this case no problem arises because we do not think the phrase in general and the word "reputation" in particular were unintended or inadvertent. But attentive as well to our obligation to make particular words responsive to the essential principle of the statute, Wollen v. Fort Lee, 27 N.J. 408, 418 (1958), we are persuaded they were employed for a purpose consistent with the design of the statute other than that suggested by appellants. Obviously, a key employee would be unable to satisfy the heavy burden of the applicant simply by appearing before the Commission and assuring its members that he was honest and diligent *345 and had never held up a bank or even been the victim of a parking ticket. His avenue is really limited to producing others who will vouch for his integrity and noncriminality. The "reputation" language was provided to afford him an opportunity to demonstrate his wares. We are convinced it was not designed as an incontestable escape valve for one who without it may have little chance. This is the meaning appellants attribute to the language. In their brief they insist that once the Commission found that several witnesses testified as to Clifford Perlman's good reputation, its "task was properly over at that point."
From this it would follow that a parade of friendly witnesses could override proven disqualifying character facts. We are certain the Legislature never intended this. We will not interpret a statute so as to produce an unreasonable or absurd result. State v. Gill, 47 N.J. 441, 444 (1966).
We are convinced that the authority delegated was to enable the Commission to determine what the key employee is, rather than what he is thought to be. If what he is thought to be satisfies them as to what he is, so be it. That is the true purpose of the statute and the reason the word "reputation" appears.
Second, the Perlmans complain of the purportedly unconstitutional "vagueness" of the "good character" criterion.
A statute is unconstitutional if it is couched in terms "so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." State v. Lashinsky, 81 N.J. 1, 17-18 (1979). Nevertheless, the fact that certain statutory phrases are not "impeccable specimens of draftsmanship does not impugn their legality," as long as procedural and judicial safeguards are available. In Review of Health Care Admin. Bd. v. Finley, 168 N.J. Super. 152, 167 (App.Div. 1979), aff'd sub nom. New Jersey Ass'n of Health Care Facilities v. Finley, 83 N.J. 67 (1980), app. dism. sub nom. Wayne Haven Nursing Home v. Finley, 449 U.S. 944, 101 S.Ct. 342, 66 L.Ed.2d 208 (1980).
*346 Furthermore, the words of a statute must not be considered to exist in a vacuum, without reference to relevant policy considerations as they are expressed in the whole act, or without regard for the words of balance of the statute. See Matawan v. Monmouth Cty. Tax Bd., 51 N.J. 291, 299 (1968). It is not too much for the law to expect "men of common intelligence" to realize this.
We are satisfied that thus viewed, the words "good character" in the context of the Casino Control Act leave to men of common intelligence little doubt about their meaning.
As was said in In re DeMarco Suspension, 83 N.J. 25 (1980), in connection with a statute regulating physicians:
The question ultimately is one of fairness, given the statute and its provisions, and given the situation of the defendant. Should he have understood that his conduct was proscribed, should he have understood that the penalty about to be imposed was the sanction intended by the Legislature? The test is whether the statute gives a person of ordinary intelligence fair notice that his conduct is forbidden and punishable by certain penalties. That test, however, does not consist of a linguistic analysis conducted in a vacuum. It includes not simply the language of the provision itself, but related provisions as well, and especially the reality to which the provision is to be applied. The test here is whether a physician of ordinary intelligence would have understood, and would have been given fair notice by virtue of these provisions, that his conduct rendered him liable to a $200 penalty as to each patient. [at 37]
New Jersey courts have rejected vagueness arguments attacking criteria no more definite than the one at issue. In In re Com'r of Bank. v. Parkwood Co., 98 N.J. Super. 263, 273 (App.Div. 1967), the court found that the terms "incompetency" and "unworthiness" were adequate for judging the conduct of insurance agents and brokers. In Moyant v. Paramus, 30 N.J. 528, 552-553 (1959), a licensing standard requiring a finding of such "business and moral character" as deemed "necessary for the protection of the public good" was held to be sufficiently definite. And see State v. Rosenthal, 559 P.2d 830, 835 (Nev.Sup.Ct. 1977), app. dism. 434 U.S. 803, 98 S.Ct. 32, 54 L.Ed.2d 61 (1977), in which the Supreme Court of Nevada, reversing a lower court which had overturned a gaming commission ruling, held that if the statutory standards were "inadequate legislative expressions," *347 implementing regulations "would serve to cure the defect."
Over 20 years ago our Supreme Court acknowledged constitutional readjustment whereby
... [I]n recent days we have attached greater significance to the presence of procedural and judicial safeguards against unreasonable and unwarranted agency action than we have to the presence of details in the statutory standards. See Burton et al. v. Sills, 53 N.J. 86, 91 (1968), appeal dismissed, 394 U.S. 812, 89 S.Ct. 1486, 22 L.Ed.2d 748 (1969); State v. Owens-Corning Fiberglass Corp., supra [100 N.J. Super. 366 (App.Div. 1968), aff'd o.b. 53 N.J. 248 (1969)], 100 N.J. Super. at 385; Esso Standard Oil Co. v. Holderman, 75 N.J. Super. 455, 474 (App.Div. 1962), aff'd, 39 N.J. 355 appeal dismissed, 375 U.S. 43, 84 S.Ct. 148, 11 L.Ed.2d 107 (1963). [Motyka v. McCorkle, 58 N.J. 165, 178 (1971)]
The matter comes down to a response to the dispositive inquiry posed in State v. Lashinsky, supra:
... The decisive question for purposes of this vagueness argument is whether the defendant was reasonably apprised, as a matter of common intelligence, in light of ordinary human experience, that his particular conduct was unlawful.[4] [81 N.J. at 18]
We are wholly persuaded that the potential key employee is reasonably apprised by the statute, as a matter of common knowledge, in the light of ordinary human experience, as to the kind of conduct necessary to satisfy the statute (or put another way, the kind of conduct which is likely to result in disqualification). He is reasonably apprised as well of precisely what will happen if he does not pass muster.
This being so we are content that there was no lack of fairness with respect to the Perlmans, whose sophisticated knowledge of the casino gaming industry and long-time experience with its standards and regulations was far from "ordinary." In fact, their plaint in this respect loses much of its thrust in view of the fact that whatever else it did or did not do, the Nevada Gaming Commission advised them of its decidedly negative reaction to the conduct which the New Jersey Casino Control Commission found offensive eight years later.
*348 Coupled with this vagueness issue the Perlmans also urge that a "good character" criterion "allows [the Commission] to rely upon guilt by association." The brief for the corporations iterates this argument, in effect, and claims a due process violation, citing Schware v. Board of Bar Examiners, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957). As we have indicated above, it is abundantly clear to us from the opinion of the Commission that the Perlmans were not rejected because of any "guilt" on their part in the criminal or quasi-criminal sense or because of their association with persons, some of whom, if not guilty, were almost universally thought to be. Rather, they were rejected, among other things, because, as we said above, of their apparent continuing insensitivity to the potential impact of those associations in this sensitive industry. The present protestations of the fact that those transactions were, at the time "lawful and ethical" (emphasis is the Perlmans') demonstrate that the sensitivity has not increased. The question was not then, and is not now, whether those transactions were lawful, or how lawful, or ethical, or how ethical. The question which the Perlmans failed to see then and, perhaps understandably, do not now acknowledge, is: what of the impact of those transactions and associations upon the policies intended to be served by casino gaming regulation under legislative imprimatur? Schware reports that in that matter "[t]here is nothing in the record which suggests that Schware has engaged in any conduct during the past 15 years which reflects adversely on his character." 353 U.S. at 239, 77 S.Ct. at 756. That statement cannot be made for the Perlmans, if good character in the sense here appropriate is deemed to refer to conduct not potentially detrimental to the industry. In the context of the statutes, no other definition is reasonable. Knight v. Margate, supra. Schware and others like it are distinguishable.
Both appellants' briefs also argue that since the order of the Commission requires a termination of the Perlman relationship with CWI and its subsidiaries "in this or any other jurisdiction," as a condition of BRC licensing, it offends the Commerce *349 Clause, U.S.Const., Art. I, § 8, by imposing an unreasonable burden on interstate commerce. The fallacy in this argument is that the order is said to purport "to regulate the management of substantial non-New Jersey operations ... and to limit the Perlmans' business activities outside of New Jersey," when in fact it does no such thing. It neither regulates CWI or any of its subsidiaries except BRC or the Perlmans, nor tells them what they must do. It only tells BRC, in terms completely in line with the statute and its purposes, the condition which must exist in view of its corporate connections, before it can enjoy the privilege of a casino license. No one will argue that New Jersey does not have a legitimate local public interest in determining who shall be thus licensed in New Jersey and under what conditions. We are satisfied this issue has no merit and warrants no further discussion.
We are agreed, however, that the legitimate state interests otherwise being served do not require or reasonably permit the requirement of disassociation of the Perlmans' personal interests from non-New Jersey subsidiaries of CWI which have no gaming activities. The State advances a so-called "percolating up" concern, theorizing that Perlman influence may work its way up the interstructure and manifest itself in CWI (and thereafter BRC) affairs, despite the disassociation there. Such a result is not at all inconceivable. Nevertheless, we believe the effect thus projected would be sufficiently attenuated that its force would not exceed the influence the Perlmans might continue to exert as old and experienced friends, even after divestiture. We are satisfied that neither of these is susceptible to New Jersey regulation consistent with due process. It is not insignificant that the Commission continues to retain jurisdiction over its licensees. If a "Perlman effect" becomes manifest, the Commission is not powerless. N.J.S.A. 5:12-129.
Finally, the corporations argue that the evidence supporting the Commission's finding that Malnik was a person of unsuitable character was "irrelevant, inadmissible and legally insufficient." *350 The argument is entirely frivolous. The protesting brief points out the relevance of "what the Perlmans knew about Malnik between 1971 and 1975." N.J.S.A. 5:12-107 a(6) takes care of the balance. See also, N.J.A.C. 19:42-2.6. In re Toth, 175 N.J. Super. 254 (App.Div. 1980), cited by appellants, is of no avail to them. In the matter before us there was an ample residuum of legal and competent evidence to sustain the administrative decision. Weston v. State, 60 N.J. 36, 51 (1972).
Except respecting the requirement of divestiture as it applies to non-New Jersey nongaming subsidiaries of CWI, we affirm the administrative determination. We remand to the Casino Control Commission for recasting of the order consistent with the foregoing and for reasonable revision of the timetable. The stay imposed by the Supreme Court shall remain in effect pending the recasting of the order of the Commission and thereafter until further order of this court or the Supreme Court on motion. Other than with respect to the stay as noted, we do not retain jurisdiction.
NOTES
[1] One of the expressed concerns of all the appellants is that the Perlmans are such a prime force in the corporate structure and interstructure that their departure would seriously impair the capacity of the corporations to borrow money and otherwise intrude upon the financial operations of the corporations to their detriment.
[2] See the excellent dissertation by the Hon. Milton B. Conford on "Findings of Facts and Conclusions of Law," 92 N.J.L.J. 225 (1969).
[3] The Attorney General contends that since "[a]t the hearing below applicants repeatedly referred to the pivotal issue in the case being an evaluation of the totality of the Perlmans' character" they ought now to be deemed to have waived any other "theory now sought to be raised." The Perlmans reply that since they are appellants here but were not parties below they cannot be charged with waiver from the lips of CWI's counsel. This response has technical merit. Its persuasiveness is impaired by the undeniable affinity between the Perlmans and CWI. No matter. In this significant case of apparent first impression we will decide the issues on their merits or lack thereof.
[4] Of course, the Perlmans are not defendants in the criminal sense as was Lashinsky, and no one suggests that their conduct was unlawful. The principle is no different.