182 N.J. Super. 631 (1982)
442 A.2d 1080
IN THE MATTER OF THE APPLICATION OF ANTONIO TUFI FOR LICENSURE AS A CASINO KEY EMPLOYEE.
Superior Court of New Jersey, Appellate Division.
Argued January 25, 1982.
Decided February 10, 1982.
*633 Before Judges BISCHOFF, KING and POLOW.
Donald G. Targan argued the cause for appellant Tufi.
Rosemary Quinn, Deputy Attorney General argued the cause for respondent, Department of Law & Public Safety, Division of Gaming Enforcement (Irwin I. Kimmelman, Attorney General of New Jersey, attorney; James R. Zazzali, former Attorney General of New Jersey, and Guy S. Michael, Deputy Director, *634 Division of Gaming Enforcement, of counsel and Rosemary Quinn on the brief).
The opinion of the court was delivered by POLOW, J.A.D.
Shortly after commencing employment at Resorts International Hotel Casino in Atlantic City in April 1978, appellant Antonio Tufi filed his personal history disclosure form for licensure as a casino key employee. The Division of Gaming Enforcement (Division) investigated and recommended denial. Upon receipt of a notice of intention from the Casino Control Commission (Commission) to deny his licensure application, Tufi requested a hearing, which was conducted by an administrative law judge. Following a 14-day hearing, Judge Smith rendered his initial decision concluding that Tufi failed to demonstrate qualification for licensure. The Commission substantially affirmed Judge Smith, adopted his initial decision with some modification and denied Tufi's application. On this appeal it is contended that the determination of the Commission was erroneous and that appellant's license as a casino key employee should be granted.
Tufi, who was born in Italy in 1942, is currently classified as a permanent resident alien in this country by the Immigration and Naturalization Service. He completed the equivalent of grade school in his native land, took specialized training in hotel catering and, when he was 24 years old, attended a school for croupiers in England. Upon completion of that course of study, he was employed as a roulette croupier in the Bahamas where, during 15 years with Resorts Paradise Island Casino, he became adept in the operation of blackjack, roulette and craps. He ultimately supervised the operation of those games and accumulated substantial knowledge of the design and operation of slot machines. Most recently, Resorts sought to transfer him to its Atlantic City Casino as Director of Research and Development of Casino Equipment.
*635 Among other things, the Division investigation was concerned with allegations that Tufi associated with alleged career offenders, in particular Dino Cellini, Eduardo Cellini and James Neal. The investigation also scrutinized the manner in which Tufi obtained his permanent alien registration visa, known as a "green card," issued on June 10, 1977. The Division contended that appellant gave fraudulent information in his application for the "green card." Since one of the grounds for its issuance was his investment of at least $10,000 in a business in this country, the investigation also inquired into all representations contained in his visa application, the bona fides of the business investment he relied upon therein and the sources and disposition of various amounts of cash appellant brought into the country from time to time.
Judge Smith rejected all allegations of alleged association with career offenders, misrepresentations on the "green card" application and lack of honest intent to go into business as represented. Nevertheless, denial of licensure was recommended. The administrative law judge determined that Tufi had knowingly lied to customs officials in July 1976 when he transported $37,000 in cash to Miami from the Bahamas for James Neal which he falsely claimed as his own money when passing through customs; that he knowingly violated federal law by deliberately failing to declare $11,000 in cash when he entered the country in May 1976, and that he deliberately lied to investigators of the Division about the true source of those funds and the circumstances surrounding their transportation into this country.
Tufi produced a number of character witnesses, including coemployees and Division and Commission personnel to vouch for his honesty, integrity and competence in casino gambling operations. However, they did not deal with the specific charges against him. On the other hand, Judge Smith and the Commission brushed aside seemingly damaging evidence concerning misrepresentations in Tufi's application for permanent resident status as well as the proofs concerning alleged associations *636 with individuals deemed undesirable by the terms of the statute. For example, the judge refused to rule on the charges relating to the manner in which the "green card" was obtained. He held that the issue of its validity was "not properly before me." Although the issue presented was not the validity of the "green card," it involved serious questions about the manipulations and distortions allegedly attributable to Tufi in pursuance of permanent visa status. Nevertheless, there is no appeal by the State. Hence, we do not deal with those issues.
Federal law requires disclosure of cash sums brought into the United States in excess of $5,000. 31 U.S.C.A. § 1101. Tufi now concedes that he failed to declare $11,000 which he brought into the country from the Bahamas in May 1976. He has given different accounts for his failure to comply with customs requirements. On one occasion he sought to rely on his misunderstanding of the language, and inexperience with American customs procedures. On another occasion he implicitly admitted his knowledge of the customs requirement by explaining that he did not declare the money because he brought it in more than one trip, not exceeding the $5,000 statutory maximum on any single occasion. Later, he admitted that version was false. The conclusion is inescapable that he lied to the investigator in order to conceal his noncompliance with federal law from the Division. Although the Commission in its final decision struck Judge Smith's finding that Tufi knowingly violated federal law when he carried in the $11,000, the determination that he deliberately lied to the investigator to conceal noncompliance with federal law was upheld.
The $37,000 incident is more damaging. In July 1976 Tufi carried $37,000 from the Bahamas to Miami. His supervisor in the Paradise Island Casino gave it to him to deliver to James Neal in Miami. He was instructed to declare it as his own when passing through customs. He followed these instructions despite his awareness, clearly evidenced by the record, that he was violating federal law. At the hearing he initially portrayed *637 the violation as inadvertent, the result of a misunderstanding on the part of customs officials. During the original investigation he had given sworn testimony to a Division investigator that the money was his own, saved from his salary and kept in a safe deposit box. The finding that appellant knowingly lied to customs officials is fully supported by substantial credible evidence in the record.
Tufi insists that his statements during the Division investigation regarding the transportation of the $11,000 and $37,000 were not willful misrepresentations, and even if they were, they were not misrepresentations of facts material to his qualification. Therefore, he asserts, the denial of his application was arbitrary and capricious. The State contends that Tufi attempted to conceal the true nature of the transactions and the true ownership of the money in order to avoid the risk that his association with Neal and the Cellinis might be revealed or his violations of federal law discovered.
The standard of review in considering an appeal from a Commission ruling is clearly enunciated in In re Boardwalk Regency, 180 N.J. Super. 324, 333 (App.Div. 1981):
At the outset we observe that all parties agree, as do we, that with respect to the fact finding by the agency our obligation is set and our privilege of independence is limited by Mayflower Securities v. Bureau of Securities, 64 N.J. 85 (1973). Basically, we search to discover whether the findings of fact could reasonably have been reached on sufficient credible evidence present in the record, considering the proofs as a whole, with due regard for the opportunity of the Commissioners who heard the witnesses to judge of their credibility. Where expertise is a pertinent fact, we must accord due regard in that respect as well ... [I]t is beyond cavil that in the review function the whole record must be considered. As is expressly pointed out in Mayflower, supra:
... The appellate application of this standard [i.e., that of Close v. Kordulak Bros., 44 N.J. 589, 599 (1965)] requires far more than a perfunctory review; it calls for careful and principled consideration of the agency record and findings in the manner outlined in State v. Johnson, 42 N.J. 146, 161-162 (1964). [64 N.J. at 93]
We also concur that we are "in no way bound" by the agency's interpretation of a statute or its determination of any strictly legal issue. Mayflower, supra at 93. Finally, the requirement that we defer to the expertise of the agency is only as compelling as is the expertise of the agency, and this generally only in technical matters which lie within its special competence.
*638 This language encompasses both appellant's substantial evidence argument and his assertion that the Casino Control Act, N.J.S.A. 5:12-1 et seq., was misapplied.
Following exhaustive testimony Judge Smith recommended denial of Tufi's application based upon his findings of deliberate violations of federal customs requirements and willful falsifications of facts to investigators concerning Tufi's transportation of currency into Miami. Tufi argues that unless a concealment or misrepresentation is material to a specific qualifying criterion for key employee licensure in N.J.S.A. 5:12-89, the trigger mechanism for disqualification under N.J.S.A. 5:12-86 b is not activated. He reasons that since the Commission rejected Judge Smith's ruling that he had "knowingly violated Federal law," his actions in bringing the money into the country without truthfully complying with customs regulations could not be considered as reflective of bad character. We disagree.
The portions of the Casino Control Act in issue here are:

N.J.S.A. 5:12-86. Casino license-disqualification criteria
The commission shall deny a casino license to any applicant who is disqualified on the basis of any of the following criteria:
a. Failure of the applicant to prove by clear and convincing evidence that the applicant is qualified in accordance with the provisions of this act;
b. Failure of the applicant to provide information, documentation and assurances required by the act or requested by the commission, or failure of the applicant to reveal any fact material to qualification, or the supplying of information which is untrue or misleading as to a material fact pertaining to the qualification criteria;

N.J.S.A. 5:12-89. Licensing of casino-key employees
a. No person may be employed as a casino key employee unless he is the holder of a valid casino key employee license issued by the commission.
b. Each applicant must, prior to the issuance of any casino key employee license, produce information, documentation and assurances concerning the following qualification criteria:
(1) Each applicant for a casino key employee license shall produce such information, documentation and assurances as may be required to establish by clear and convincing evidence the financial stability, integrity and responsibility of the applicant, including but not limited to bank references, business and personal income and disbursements schedules, tax returns and other reports filed with governmental agencies, and business and personal accounting and check records and ledgers. In addition, each applicant shall, in writing, *639 authorize the examination of all bank accounts and records as may be deemed necessary by the commission or the division.
(2) Each applicant for a casino key employee license shall produce such information, documentation and assurances as may be required to establish by clear and convincing evidence the applicant's reputation for good character, honesty and integrity. Such information shall include, without limitation, data pertaining to family, habits, character, criminal and arrest record, business activities, financial affairs, and business, professional and personal associates, covering at least the 10 year period immediately preceding the filing of the application. Each applicant shall notify the commission of any civil judgments obtained against such applicant pertaining to antitrust or security regulation laws of the Federal government, of this State or of any other state, jurisdiction, province or country.
The Legislature emphatically imposed upon the applicant the burden to show that he meets the statutory criteria; no burden is placed on the State to disprove it. Tufi would reverse the impact of the statute which requires the applicant prove by "clear and convincing evidence" his reputation for good character, business activities and financial affairs. His insistence that the Division failed to prove wrongdoing by a fair preponderance of the evidence misconceives the burden he bears to satisfy the statutory mandate.
Tufi suggests that because he had not committed any crime he had no reason to disclose the true owner of the $37,000 or the manner in which the $11,000 was brought into Miami. This view also misconceives the statutory thrust. The administrative law judge found that Tufi deliberately lied to customs officers with regard to the true ownership of the $37,000. We find that determination is fully supported by substantial credible evidence in the record. Tufi then deliberately distorted the facts in his attempt to prevent discovery of the truth by the Division, which was investigating his possible ties with Neal and Cellini, alleged organized crime figures. His distortions and attempted concealment are particularly relevant in light of the following statutory statement of purpose concerning the exclusion of disreputable individuals:
Continuity and stability in casino gaming operations cannot be achieved at the risk of permitting persons with unacceptable backgrounds and records of behavior to control casino gaming operations contrary to the vital law enforcement interest of the State. [N.J.S.A. 5:12-1 b(15)]
*640 To regard such misrepresentations and distortions, which were offered in response to the required investigation on Tufi's application, as "not material" is to misperceive the legislative purpose expressed in the statute as a whole. In Boardwalk Regency, supra, the applicants raised a "subtle, but unpersuasive" attack on the statute hinged on interpretation of isolated sections taken out of context. We rejected this challenge
... because it ignores the prime objective of statutory construction: the search for legislative intent. Safeway Trails, Inc. v. Furman, 41 N.J. 467, 477 (1964), cert. den., 379 U.S. 14 [85 S.Ct. 144, 13 L.Ed.2d 84] ... (1964). In such pursuit the intent is to be perceived from the whole statute, and all parts of the statute must be read so that they are in alignment with the intent of the entire act. Seatrain Lines, Inc. v. Medina, 39 N.J. 222, 226-227 (1963). The statute must be read mindful of the evil which it is designed to eliminate and of the proposed remedy. Brewer v. Porch, 53 N.J. 167, 174 ... (1967). Broad latitude is to be accorded the probable intent of the Legislature in this regard toward the end of best serving these beneficent purposes. Continental Cas. Co. v. Knuckles, 142 N.J. Super. 162, 167 (App.Div. 1976). Nor will we permit the intent of the Legislature to be subverted by language which, read literally, appears to contravene that which the Legislature actually intended. As we said in Continental Cas. Co. v. Knuckles:
First attention should go to the purpose of the legislation. "Where a literal rendering will lead to a result not in accord with the essential purpose and design of the act, the spirit of the law will control the letter." N.J. Builders, etc., Ass'n v. Blair, 60 N.J. 330, 338 (1972). It cannot be better put than as by Justice Heher in San-Lan Builders, Inc. v. Baxendale, 28 N.J. 148, 155 (1958), "Reason is the soul of law." [At 167]. [180 N.J. Super. at 343-344]
Whether the acts committed by Tufi as determined by the Commission were criminal is immaterial. Misrepresentations and deliberate disortions are material when, as here, they reflect on the integrity of the applicant. There is ample support in the record for the Commission's conclusion that Tufi's deliberate attempt to mislead the Division related to vital issues in its investigation and adversely reflect on his integrity.
Tufi's argument that the misrepresentations were not willful because he was sick or confused or tired after long hours of questioning is unpersuasive. Judge Smith found that his answers to the questions were false. The proofs in this regard led the judge to conclude that the applicant's deception was *641 "carefully crafted" in order to avoid revealing the truth to the Commission. This is, again, supported by substantial credible evidence in the record, considering the proofs as a whole, with due regard for the opportunity of the administrative law judge, who heard the witnesses, to judge their credibility in this regard. Mayflower Securities v. Bureau of Securities, supra.
The incorrect answers and obvious evasions were not limited to depositions taken by investigators prior to trial. His answers given during the hearing, when he was fully represented by counsel, were, in some material respects, inaccurate and evasive. The transcript supports the conclusion that even at the hearing, where the questions were clear and fully understood by Tufi, he nevertheless continued to attempt to evade the truth and distort the facts. He had earlier advised the investigator that he had saved the $37,000 from his income in the Bahamas. At the hearing he initially suggested that it was his first time through customs and he "just declared the money," thus intimating misunderstanding on the part of customs officials who assumed it was his. When confronted with the fact that he had come through customs previously, he ultimately conceded that he knowingly declared the money as his own although it was not.
The State refused, on the basis of confidentiality, to produce Investigator Romonowski's report in toto, after his direct testimony, for use on cross-examination. Appellant argues that this is so prejudicial that it warrants a reversal of the denial of his application.
Although Tufi repeatedly refers to Romonowski as the "principal investigator" and "key witness," there was at least one other investigator and there were many other witnesses. The cases cited in support of mandatory production of Romonowski's notes are those in which the testimony to which the notes referred was admitted in evidence. Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957); State v. Hunt, 25 *642 N.J. 514 (1958); Falcone v. N.J. Bell, 98 N.J. Super. 138 (App. Div. 1967), certif. den., 51 N.J. 190 (1968). Hess v. Hess, 83 N.J. Super. 583 (App.Div. 1964); State v. Mucci, 25 N.J. 423 (1957). Here, when the State refused to produce the report, Romonowski's testimony was stricken from the record at appellant's request.
Appellant also attacks the use of information taken from his depositions prior to trial because he was deprived of the right to have counsel present. He reasons that at this time the Commission had already determined to deny his license and that once the Division's role switched from investigative to prosecutorial, he was entitled to have the benefit of counsel and that the denial thereof constitutes reversible error. We are satisfied that in processing this application, the Division could properly depose Tufi without the presence of counsel. The applicant bore the burden of persuading the Commission, by clear and convincing proof, to issue the license sought. The Division, charged with the statutory duty to investigate each applicant for licensure, must also prosecute and defend all cases before the Commission.

N.J.S.A. 5:12-76. General duties and powers
a. The Division of Gaming Enforcement shall promptly and in reasonable order investigate all applications, enforce the provisions of this act and any regulations promulgated hereunder, and prosecute before the commission all proceedings for violations of this act or any regulations promulgated hereunder. The division shall provide the commission with all information necessary for all action under Article 6 of this act and for all proceedings involving enforcement of the provisions of this act or any regulations promulgated hereunder.
b. The division shall:
(1) Investigate the qualifications of each applicant before any license, certificate, or permit is issued pursuant to the provisions of this act;
(2) Investigate the circumstances surrounding any act or transaction for which commission approval is required;
(3) Investigate violations of this act and regulations promulgated hereunder;
(4) Initiate, prosecute and defend such proceedings before the commission, or appeals therefrom, as the division may deem appropriate; ....
*643 The word "investigate" takes on special meaning in this sensitive industry. It is a continuous, ongoing and necessarily thorough process. See, e.g., N.J.S.A. 5:12-63(g) ("Duties and Powers of the Commission"):
........
g. To review and rule upon any complaint by a casino licensee regarding any investigative procedures of the division which are unnecessarily disruptive of casino operations. The need to inspect and investigate shall be presumed at all times. [Emphasis supplied]
"The presence of advisors to witnesses might easily so far encumber an investigatory proceeding as to make it unworkable or unwieldy." In re Groban, 352 U.S. 330, 334, 77 S.Ct. 510, 513, 1 L.Ed.2d 376 (1957). This is particularly true in a matter which substantially involves the public interest. Ibid. Since the depositions were an essential part of the investigation, the full panoply of due process rights did not attach; presence of counsel was not required. Hannah v. Larche, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960).
Although he was fully represented by counsel at the hearing, with all privileges usually associated therewith, appellant nevertheless characterizes his earlier lack of counsel and the Division's failure to provide him with deposition transcripts as fundamentally unfair and violative of due process. We agree that where a liberty or property interest is at stake, due process applies. However, "the question remains what process is due." Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). In a civil matter there is "no thought to equate this [procedural pattern] to a criminal prosecution in any sense." Id. at 489, 92 S.Ct. at 2604; Nicoletta v. North Jersey Dist. Water Supply Comm'n, 77 N.J. 145, 165 (1978). "[W]hat process is due varies in relation to the interests at stake and the nature of the governmental proceedings." Lassiter v. Department of Social Studies, 452 U.S. 18, 37, 101 S.Ct. 2153, 2164, 68 L.Ed.2d 640, 656 (1981) (dissenting opinion). We conclude, *644 without hesitation, that appellant's due process rights were fully satisfied.
We have long recognized the necessity of strictly controlling certain industries which present a potential, innate danger to the public, and therefore subject them to close and intensive investigation and regulation. Thus, we have dealt with liquor licensing as a subject apart because of its inherent evils. Grand Union Co. v. Sills, 43 N.J. 390, 398 (1964); see, also, Lyons Farms Tavern, Inc. v. Municipal Board of ABC, 68 N.J. 44, 49 (1975). A license to permit such a business is "not a contract for nor ... a property right. Rather it is a temporary permit or privilege to pursue an occupation which is otherwise illegal ... [I]t may ... be entirely prohibited, or be permitted [only] under such conditions as will limit to the utmost its evils." Mazza v. Cavicchia, 15 N.J. 498, 505 (1954).
Similarly, racing, with attendant legalized gambling, "strongly affected by a public interest," has also been treated as a "highly appropriate" subject for close regulatory supervision. Niglio v. N.J. Racing Comm'n, 158 N.J. Super. 182, 188 (App.Div. 1978); Jersey Down, Inc. v. N.J. Racing Comm'n, 102 N.J. Super. 451, 457 (App.Div. 1968). "We see every reason, including those expressed in N.J.S.A. 5:12-1(b) for legalized casino gaming to take its deserved place among those industries. See Bally Mfg. Corp. v. N.J. Casino Control Comm'n, supra, 85 N.J. [325] at 331." In re Boardwalk Regency, supra, 180 N.J. Super. at 341.
We are fully convinced, after a careful review of the entire extensive record and the briefs on appeal, that there has been no miscarriage of justice, that the action of the Commissioner was not arbitrary and capricious nor against the weight of credible evidence and that appellant was not denied fundamental fairness or the right to a fair hearing. The decision of the Commission is supported by sufficient credible evidence on the record as a whole. Mayflower Securities v. Bureau of Securities, supra.
Affirmed.